# 23-7202(L)

## 23-7745(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

—against—

STEPHEN BUYER, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

DANIEL A. RUBENS
DANIEL R. ALONSO
ALYSSA BARNARD-YANNI
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

ELIZABETH A. BIXBY
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, California 90071
(213) 629-2020

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ........................................................................ 1

JURISDICTION ........................................................................... 3

STATEMENT OF THE ISSUES................................................... 3

STATEMENT OF THE CASE .................................................... 4

    After Decades Of Military And Congressional Service, Mr.
    Buyer Starts A Consulting Business..................................... 4

    Mr. Buyer Purchases Sprint Stock In 2018 ...................... 6

    Mr. Buyer Purchases Navigant Stock In 2019 ............... 10

    Guidehouse Investigates Mr. Buyer's Trading And Finds No
    Evidence Of Wrongdoing ...................................... 14

    Mr. Buyer Is Indicted And Convicted For Insider Trading In
    Sprint And Navigant Stock .................................. 16

SUMMARY OF THE ARGUMENT ........................................ 27

STANDARD OF REVIEW.......................................................... 29

ARGUMENT ............................................................................. 30

    I.    The District Court Erred In Admitting The Cellebrite
        Report And Volchko's Surrogate Testimony. ....................... 30

        A.    Admission of the Cellebrite Report through
            Volchko's surrogate testimony violated Mr.
            Buyer's Confrontation Clause rights. ......................... 31

            1.    The Cellebrite Report is testimonial................. 31

            2.    The government's reliance on surrogate
                testimony does not cure the Confrontation
                Clause violation. ............................................... 33

            3.    Mr. Buyer preserved his Confrontation
                Clause challenge. ............................................... 37

B.     The government failed to authenticate the Cellebrite Report. ....................................... 38

C.     Volchko's lay witness testimony improperly applied her specialized knowledge. ............................ 41

D.     The error in admitting Volchko's testimony and the Cellebrite Report was not harmless beyond a reasonable doubt. ........................................ 45

II.    The Government Failed To Prove Venue Was Proper. ....... 48

A.     The New York Stock Exchange's physical headquarters does not establish SDNY venue over trades not executed in SDNY. ............................ 50

B.     The government did not prove that Mr. Buyer's trades cleared or settled in SDNY. ............................ 54

C.     None of the government's other venue evidence was sufficient to establish SDNY venue. .................... 55

III.   The Evidence Was Legally Insufficient To Convict Mr. Buyer. .................................................................. 59

A.     The evidence was legally insufficient to convict Mr. Buyer for his purchases of Sprint stock. .............. 60

B.     The evidence was legally insufficient to convict Mr. Buyer for his purchases of Navigant stock. ......... 67

CONCLUSION ..................................................................... 75

CERTIFICATE OF COMPLIANCE

SPECIAL APPENDIX

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of China v. NBM LLC,*
  359 F.3d 171 (2d Cir. 2004) ................................................................ 44

*Bullcoming v. New Mexico,*
  564 U.S. 647 (2011) ...................................... 1, 31, 32, 33, 34, 35, 39, 40

*Crawford v. Washington,*
  541 U.S. 36 (2004) ................................................................... 31, 35

*Garlick v. Lee,*
  1 F.4th 122 (2d Cir. 2021) ................................................................ 32

*Glazer v. Formica Corp.,*
  964 F. 2d 149 (2d Cir. 1992) .............................................................. 71

*Hall v. United States,*
  58 F.4th 55 (2d Cir. 2023) ................................................................ 29

*Hemphill v. New York,*
  595 U.S. 140 (2022) ................................................................... 31, 35

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ...................................................................... 30

*Langston v. Smith,*
  630 F.3d 310 (2d Cir. 2011) ........................................................... 65, 71

*Melendez-Diaz v. Massachusetts,*
  557 U.S. 305 (2009) ...................................................................... 31

*In re NYSE Specialists Sec. Litig.,*
  503 F.3d 89 (2d Cir. 2007) ................................................................ 51

*Ryan v. Miller,*
  303 F.3d 231 (2d Cir. 2002) .............................................................. 36

iii

*SEC v. Monarch Fund,*
    608 F.2d 938 (2d Cir. 1979) ........................................................ 71, 72

*SEC v. Tex. Gulf Sulphur Co.,*
    401 F.2d 833 (2d Cir. 1968) ............................................................... 73

*Smith v. Arizona,*
    No. 22-899, 2023 WL 6319655 (U.S. Sept. 29, 2023) ......................... 36

*Smith v. United States,*
    599 U.S. 236 (2023) ........................................................................... 50

*Stuart v. Alabama,*
    139 S. Ct. 36 (2018) ........................................................................... 36

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008) ............................................................... 45

*United States v. Becker,*
    502 F.3d 122 (2d Cir. 2007) ............................................................... 45

*United States v. Bentvena,*
    319 F.2d 916 (2d Cir. 1963) ............................................................... 48

*United States v. Chow,*
    993 F.3d 125 (2d Cir. 2021) ....................................... 22, 52, 54, 55, 56

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012) ......................................................... 59, 71

*United States v. Cusimano,*
    123 F.3d 83 (2d Cir. 1997) ................................................................. 71

*United States v. Eason,*
    920 F.2d 731 (11th Cir. 1990) ............................................................ 48

*United States v. Fortenberry,*
    ___ F.4th ___, 2023 WL 8885105 (9th Cir. Dec. 26, 2023) ..... 48, 49, 58

*United States v. Ganias,*
    824 F.3d 199 (2d Cir. 2016) ............................................................... 41

iv

*United States v. Garcia,*
  413 F.3d 201 (2d. Cir. 2005) ............................................... 41, 42, 43, 44

*United States v. Geibel,*
  369 F.3d 682 (2d Cir. 2004) ........................................................ 52, 53

*United States v. Glenn,*
  312 F.3d 58 (2d Cir. 2002) ................................................................ 74

*United States v. Grant,*
  967 F.2d 81 (2d Cir. 1992) ........................................................... 39, 40

*United States v. Hajbeh,*
  565 F. Supp. 3d 773 (E.D. Va. 2021) ............................................ 39, 40

*United States v. Haynes,*
  729 F.3d 178 (2d Cir. 2013) ..................................................... 42, 43, 44

*United States v. Heithaus,*
  391 F.2d 810 (3d Cir. 1968) ........................................................ 66, 74

*United States v. Jass,*
  569 F.3d 47 (2d Cir. 2009) ................................................................ 30

*United States v. Khalil,*
  857 F.3d 137 (2d Cir. 2017) .............................................................. 30

*United States v. Khalupsky,*
  5 F.4th 279 (2d Cir. 2021) ................................................................ 54

*United States v. Landji,*
  No. 18-cr-601, 2022 WL 2334509 (S.D.N.Y. June 27, 2022) ............. 35

*United States v. Lange,*
  834 F.3d 58 (2d Cir. 2016) ........................................................... 57, 58

*United States v. Litvak,*
  808 F.3d 160 (2d Cir. 2015) .............................................................. 30

*United States v. Lorenzo,*
  534 F.3d 153 (2d Cir. 2008) ........................................................ 65, 70

*United States v. Marsh*,
568 F. App'x 15 (2d Cir. 2014) ........................................................... 44

*United States v. Mylett*,
97 F.3d 663 (2d Cir. 1996) .................................................................. 72

*United States v. Nusraty*,
867 F.2d 759 (2d Cir. 1989) ................................................................ 66

*United States v. Olano*,
507 U.S. 725 (1993) ............................................................................ 38

*United States v. Pauling*,
924 F.3d 649 (2d Cir. 2019) ......................................................... 65, 70

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007) ......................................................... 43, 44

*United States v. Riley*,
638 F. App'x 56 (2d Cir. 2016) ..................................................... 52, 53

*United States v. Rodriguez-Gonzalez*,
899 F.2d 177 (2d Cir. 1990) ................................................................ 37

*United States v. Ruggiero*,
928 F.2d 1289 (2d Cir. 1991) ....................................................... 39, 40

*United States v. Smith*,
520 F.2d 1245 (8th Cir. 1975) ............................................................ 48

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003) .................................. 49, 51, 52, 53, 54, 58

*United States v. Taylor*,
816 F.3d 12 (2d Cir. 2016) .................................................................. 66

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994) ............................................................ 64, 70

*United States v. Tzolov*,
642 F.3d 314 (2d Cir. 2011) .......................................................... 30, 59

vi

**Constitutional Provisions**

U.S. Const. amend. VI ................................................................ 51

**Statutes & Rules**

15 U.S.C. § 78aa(a) ............................................................ 49, 52

15 U.S.C. § 78ff ..................................................................... 4

15 U.S.C. § 78j(b) ................................................................. 4

18 U.S.C. § 1348 .................................................................... 4

18 U.S.C. § 3231 .................................................................... 3

18 U.S.C. § 3237(a) ............................................................... 49

28 U.S.C. § 1291 .................................................................... 3

Fed. R. Crim. P. 16(a)(1)(G) ................................................ 41

Fed. R. Crim. P. 51(b) .......................................................... 37

Fed. R. Crim. P. 52(b) .......................................................... 37

Fed. R. Evid. 701(c) ................................................... 30, 42, 44

Fed. R. Evid. 901(a) .............................................................. 38

**Other Authorities**

Br. for the United States, *United States v. Riley*,
  No. 15-1541 (Oct. 26, 2015), 2015 WL 6522453 ................................. 53

NYSE, *The History of NYSE*, https://tinyurl.com/bdek8z6b
  (last visited Jan. 2, 2024) ................................................... 51

## INTRODUCTION

Defendant Stephen Buyer is a lifelong public servant who served his country for decades in the military and in Congress. Now, he stands convicted of trading on inside information that the government claims he obtained as a private-sector consultant after leaving Congress. According to the government, Mr. Buyer threw away his life's work and reputation for the modest proceeds of two distinct insider trading schemes a year apart. He was charged with, and ultimately convicted of, four counts of securities fraud based on highly speculative circumstantial evidence after a trial marred by significant and prejudicial errors.

First, the government relied heavily at trial on the results of a digital forensic report created by an FBI analyst who did not testify at trial. Instead, the government admitted the report through the trial testimony of a different analyst, who neither performed the analysis nor prepared the reports in question. This was plainly contrary to *Bullcoming v. New Mexico*, which holds that "surrogate testimony" like that here violates the Confrontation Clause. 564 U.S. 647, 652 (2011). Making matters worse, the forensic analysis in question was not

1

properly authenticated, and the testifying analyst (who was not disclosed as—and the government conceded was not testifying as—an expert) gave impermissible testimony drawing on her specialized experience and training in digital forensics.

Second, the government failed to prove venue was proper in the Southern District of New York (SDNY). The government's venue case relied primarily on the fact that the New York Stock Exchange (NYSE) is physically headquartered in Manhattan, but the location of the NYSE's corporate offices does not itself establish SDNY venue. The other purported ties to SDNY cited by the government and the district court were likewise insufficient for the jury to find SDNY venue.

Finally, the government's attenuated and speculative evidence was legally insufficient to convict Mr. Buyer for insider trading. The government alleged that Mr. Buyer, on two occasions roughly a year apart, learned of his consulting clients' potential mergers or acquisitions and then traded on that information. But the government failed to prove that Mr. Buyer possessed any material non-public information (MNPI) at the time he traded. On both counts, the government's case boils down to an assumption that the timing of Mr.

2

Buyer's trades just couldn't be a coincidence.  But the law is clear that suspicion of this sort is not a legally sufficient basis to convict.  This Court should reverse Mr. Buyer's convictions or, at a minimum, vacate and remand for a new trial in a district where venue is proper.

## JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231.  It entered a judgment of conviction on September 19, 2023, SPA8-16, and an amended judgment of conviction awarding restitution on November 7, 2023, SPA17-24.  Mr. Buyer timely noticed an appeal from the original judgment on September 22, 2023, A68-69, and from the amended judgment on November 9, 2023, A82-83.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether a forensic analysis of the contents of Christopher Stansbury's phone was properly admitted into evidence through the lay witness testimony of Jessica Volchko, a surrogate witness who did not perform the analysis but nonetheless testified based on her specialized training and experience.

3

2.      Whether venue for the charged insider-trading offenses lies in SDNY.

3.      Whether the evidence was sufficient to convict Mr. Buyer of securities fraud.

## STATEMENT OF THE CASE

The government charged Mr. Buyer with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and two counts of securities fraud in violation of 18 U.S.C. § 1348 for purchases of Sprint and Navigant stock he made in 2018 and 2019, respectively.  A26-45. Following trial, the jury found Mr. Buyer guilty on all counts.  A528. The district court (Berman, J.) denied Mr. Buyer's post-trial motions, SPA7, and sentenced him principally to 22 months' imprisonment, SPA10, 19.

### *After Decades Of Military And Congressional Service, Mr. Buyer Starts A Consulting Business*

Mr. Buyer, a decorated Gulf War veteran awarded the Bronze Star for his military service, is a retired Colonel with 30 years of active and reserve military service who represented Indiana's Fourth and Fifth congressional districts in the U.S. House of Representatives from 1993 to 2011.  A371, 406, 409.  When Mr. Buyer left Congress, he and

4

his former chief-of-staff Michael Copher started a consulting and
lobbying business focused on the VA, healthcare, and communications.
A99, 410.

Mr. Buyer's first consulting client was T-Mobile.  A100.  Mr.
Buyer met T-Mobile's Vice President for Federal Legislative Affairs,
Anthony Russo, during Mr. Buyer's time in Congress.  A143.  Over the
years, Mr. Buyer and Russo became good friends, largely through golf.
A101, 175, 427, 436.  Russo hired Mr. Buyer as a consultant primarily
because of his relevant congressional committee experience.  A145.

Another one of Mr. Buyer's consulting clients was Guidehouse, a
government consulting firm spun off from PricewaterhouseCoopers.
A203.  Mr. Buyer's primary contact there was Christopher Stansbury, a
sales director.  A90, 109, 446.  Mr. Buyer consulted largely on VA
healthcare projects.  A110, 446.

Mr. Buyer's consulting business grew quickly, and by 2018 he was
making "money that [he] never dreamed [he] would make."  A423.  He
accordingly made it a point to pay forward kindness he had received
early in his military career by financially supporting friends and family
in need.  A405-406, 426.  For example, he opened college funds for his

5

six grandchildren, A422, and funded a retirement account and provided other financial support for a longtime friend, a single mother, after she lost her job, A301-302, 426.[1]

As his consulting business grew, Mr. Buyer took up investing as a hobby. A413. He had grown up discussing investing with his father (himself an amateur investor). A403, 413. He also shared this interest with his son, who worked as a financial advisor; the two would regularly share articles and stock recommendations by email. A417-419, 758-760. Over the five-year period Mr. Buyer pursued his interest in investing—approximately 2015 to 2019—he traded in over 75 different stocks. A419. At one point, Mr. Buyer had around $3 million in investments across his various accounts. A423.

### Mr. Buyer Purchases Sprint Stock In 2018

The government charged Mr. Buyer with purchasing Sprint stock based on MNPI he allegedly obtained from Russo on a three-day golf

---

[1] As the government took pains to emphasize at trial, A91, 301-302, 470-471, 473-474, Mr. Buyer and this friend were at times romantically involved. A301. Their relationship was platonic at the time he opened her retirement account and made the investments relevant here. A301-302, 425-426, 473. Mr. Buyer had full access to the account and his friend's authorization to trade in it. A303, 422.

trip they took together in March 2018. The government's circumstantial case turned almost exclusively on the fact that Mr. Buyer's trades were roughly contemporaneous with that golf trip, which coincided with the restarting of merger discussions between T-Mobile and Sprint. The precise timeline of events is thus key to understanding the government's case.

On March 25, 2018, Russo invited Mr. Buyer to join Russo's family on a golf trip to Doral, a golf resort in Miami, the following week. A184, 435. Before leaving for Florida, Mr. Buyer deposited approximately $115,000 into various Schwab investment accounts. A353-354, 432-433, 550-558. He arrived in Miami on March 27; Russo and his family arrived on March 28. A149, 185, 435. Mr. Buyer, Russo, and Russo's father played a round of golf the afternoon of March 28; Russo and his father shared a golf cart, and Mr. Buyer rode in a golf cart of his own. A154, 190-191, 435-436. After dining separately, Mr. Buyer ran into the Russo family that night at Doral, then went back to his room for the evening. A154-155, 436-437.

On the morning of March 29, 2018, Mr. Buyer purchased 42,675 shares of Sprint stock in various accounts, all of which he was

7

authorized to trade in. A271, 560, 756. He also purchased 10,000 shares of stock in Tellurian. A354, 455. Later that day, he attended a Heart Association fundraiser. A437. He did not see Russo, who spent much of March 29 working on Sprint-related matters, as explained below. A155-158, 437; *infra* 9. On March 30, Mr. Buyer played golf with Russo again, along with Russo's father and son; he shared a golf cart with Russo's son. A437-438. Mr. Buyer left directly from the golf course to the airport to catch his flight home for Easter. A438.

Back home in Indiana, Mr. Buyer purchased an additional 10,000 and 60,000 shares of Sprint stock on, respectively, April 3 and 5, 2018. A267, 271, 560, 756. He held the stock until August 2018, when he sold it. A267-269.

Meanwhile, in spring 2018, T-Mobile and Sprint renewed merger discussions that had previously fallen apart in fall 2017. A169. Russo was informed of the renewed merger talks (given the code name "Project Lakes") by March 27, 2018, shortly before his family vacation to Florida. A146, 149. Russo's work on the merger was "[e]xtremely rapid and fast and fast-moving." A149. While he "tr[ied] not to do very much" work on vacation, "especially on the golf course," A150, he couldn't avoid work

entirely. He took a few calls the evening of March 28, A155, 680, worked most of the afternoon and evening of March 29, A155-158, and had more calls in the afternoon and evening of March 30, A159-160, 718-719.

Part of Russo's early work on the merger involved reaching out to key T-Mobile consultants. Perhaps the most important consultant was Manus Cooney, who had extensive connections at the U.S. Department of Justice (DOJ) Antitrust Division, which would be scrutinizing any merger between T-Mobile and Sprint. A148, 193-194, 445. Given Cooney's DOJ connections, getting him involved in the merger talks right away was an early priority of T-Mobile's top leadership. Russo first reached out to Cooney at the end of his Florida trip, on March 30. A160, 719. And in the following days, Russo frequently communicated with Cooney's business partner regarding early merger preparations. A162-163.

While coordinating with Cooney and his business partner, Russo continued his outreach to other T-Mobile consultants. He connected with most of the key players between March 29 and April 14, with the bulk of the outreach occurring in April, after the Easter holiday. *See*

9

A191-192; *see also* A163-165, 680-681.  Russo met with the complete

group of consultants working on the merger (including Mr. Buyer) for

the first time on April 16, 2018.  A166-167, 534.  Mr. Buyer was asked

to sign a nondisclosure agreement on April 18, 2018.  A168.

The T-Mobile/Sprint merger was publicly announced on April 29,

2018.  A146.  After the announcement, Russo and others at T-Mobile

continued working on regulatory approvals for the merger, which closed

in 2020.  A147, 169.

### Mr. Buyer Purchases Navigant Stock In 2019

The government also charged Mr. Buyer with purchasing

Navigant stock based on MNPI he allegedly obtained from Christopher

Stansbury in June 2019.  Again, the government's case turned on a

series of speculative inferences from the timing of Mr. Buyer's trades.

In April 2019, Mr. Buyer's consulting client Guidehouse began

exploring the possibility of acquiring another consulting firm, Navigant.

A205-207.  Navigant, like Guidehouse, had a robust healthcare

consulting business.  A207-208.  One reason Guidehouse was interested

in acquiring Navigant was Navigant's experience with revenue cycle

management (RCM) outsourcing.  A209.  RCM refers to "the way in

10

which a hospital captures revenue from the patient"—basically, getting its bills paid.  A108-109.

Alicia Harkness, the partner in charge of Guidehouse's government healthcare consulting practice, A109, learned of Guidehouse's interest in acquiring Navigant at the end of April 2019 and worked on the potential acquisition over the following months. A205-210.  In connection with Guidehouse's potential bid for Navigant, an analyst at Veritas Capital (the private equity firm that owned Guidehouse) sent Harkness several emails requesting data to illustrate the ways in which Guidehouse's acquisition of Navigant could be mutually profitable, including identifying "healthcare synergies" the acquisition could create, such as in the RCM space on VA-related work. A211-213, 538-544.

Harkness obtained permission from Guidehouse's CEO to enlist Stansbury's help in answering Veritas's questions because he had access to a tool compiling all government consulting contracts.  A213, 218.  She called Stansbury, and then followed up with an email into which she hurriedly cut and pasted language verbatim from Veritas's emailed request:

11

| Message | |
|---|---|
| **From:** | Alicia K Harkness [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5D8111D2FD4D4ABF8728894EFC649D8F-AHARKNESS] |
| **Sent:** | 6/12/2019 9:44:49 PM |
| **To:** | Christopher Stansbury [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a3718125a1bb456b81c5f20bad95fa6d-cstansbury] |
| **Subject:** | Help? [INTERNAL USE ONLY] |

numbers to show the **total addressable market opportunity,** rather than run-rate revenue opportunity? So for example – we are currently showing a $1 million revenue synergy for RCM work at the VA. In reality, the total opportunity for RCM work at VA could be $[500] million (I'm making up a placeholder number here).

Of course, this estimate of "market potential" will be preliminary and not underwritten into any internal forecast. However, the goal of this exercise is to demonstrate a significant addressable market that is unlocked through this combination

A545; *see* A213-214.[2]

Harkness did not tell Stansbury about the context for this time-sensitive request and did not intend to inform him of a potential transaction; she just "wanted him to answer one question, the total addressable market opportunity."  A214, 229.

Fifteen minutes after receiving Harkness's email, Stansbury called Mr. Buyer, A218-219, who had worked on RCM issues for the VA while in Congress, A108.  Stansbury asked Mr. Buyer to get "the latest numbers on VA rev cycle."  A449.  Mr. Buyer reached out to a staffer on

---

[2] Email timestamps are in Coordinated Universal Time (UTC); this email was sent at 5:44 p.m. ET.  A217.

the House Veterans Affairs Committee, who texted Mr. Buyer a link to an overview of the VA's 2020 budget. A449-450, 614-651. Mr. Buyer forwarded that budget document to Stansbury, along with a summary of the VA's "Budget Medical Collections" from 2018, 2019, and 2020. A450, 733-734. Stansbury forwarded this information to Harkness, A219-220, 613-651, then texted Mr. Buyer, "Nailed it." A338, 734.

Hours later, on the night of June 12, Buyer logged into his online Schwab account. A339. In the early morning hours of June 13, Mr. Buyer looked up a number of stocks on Schwab's website, including Alteryx Inc., Twilio Inc., and Navigant. A263, 549. Later that day, Mr. Buyer sent an email to his son forwarding a report from Zacks, an investment research firm, stating that Navigant is a "Top Pick[]" with "Zacks Rank #2 (Buy) and strong growth potential." A254, 339, 546-47. Shortly thereafter, Mr. Buyer purchased 28,300 shares of Navigant stock. A272, 339. He purchased additional shares over the following weeks for a total of 46,654 shares. A272, 713-714.

On August 2, Guidehouse publicly announced its acquisition of Navigant. A272. Buyer sold 45,700 shares that day and the remaining 954 shares on September 23. A272.

13

### *Guidehouse Investigates Mr. Buyer's Trading And Finds No Evidence Of Wrongdoing*

In August 2019, the Financial Industry Regulatory Authority (FINRA) notified Guidehouse that it was reviewing trading in Navigant stock in advance of Navigant's acquisition by Guidehouse. A248, 250-251. FINRA commonly conducts such reviews to evaluate trading around "an event like an acquisition that impacts the price of a security." A250. To that end, FINRA sent Guidehouse a list of people who had traded in Navigant stock before the acquisition announcement. A250-251, 259. Mr. Buyer, his wife, and his son were on the list. A259.

Outside counsel for Guidehouse (Schulte Roth & Zabel LLP) conducted an investigation in response to FINRA's inquiry, which involved "aggressive efforts" to locate both exculpatory and inculpatory evidence. A248, 251, 259. As part of that investigation, Schulte interviewed several individuals on October 31, 2019, including Harkness, Stansbury, and Mr. Buyer. A251-252. During Mr. Buyer's interview, he explained that he bought Navigant stock after seeing a Zacks recommendation and denied knowledge of any potential acquisition at the time he traded. A254-255, 257. Schulte never disclosed the contents of the Stansbury interview, citing privilege.

14

A259. The firm, however, collected Stansbury's iPhone to image. A251-252.

After Mr. Buyer's interview with Guidehouse, he reached out to Stansbury, who he knew had also been interviewed, via Signal (an encrypted messaging service). A319-320, 463-464. The Signal message read:

> I need to see you. Please ... I will catch next flight. I was interviewed and told them I bought and I figured it was either Huron or Navigant on my own which is true and no one ever told me or uttered the word Navigant which is also true ... I had seen Zach's research that recommend it around <u>June 8</u> as a buy and had sent an Email to my son about it ... he never replied.
>
> NOV 2 1:49 PM



Chris Stansbury set disappearing message time to 5 minutes.

A548.

After conducting its interviews and reviewing Stansbury's phone, call logs, emails, internal Guidehouse documents, and other sources,

15

outside counsel reported to FINRA "that there was no evidence that Guidehouse employees shared [MNPI] with Buyer." A259.

### *Mr. Buyer Is Indicted And Convicted For Insider Trading In Sprint And Navigant Stock*

Notwithstanding the conclusion of Guidehouse's outside counsel, the government ultimately indicted Mr. Buyer for insider trading in connection with his purchases of not only Navigant, but also Sprint stock. A key issue at trial was whether Mr. Buyer possessed any MNPI when he traded. The government's case included testimony from the following witnesses:

*Michael Copher*. At trial, the government presented testimony from Copher, Mr. Buyer's business partner, to try to prove Mr. Buyer's possession of MNPI.[3] Copher testified that at some point in 2018, Mr. Buyer called him and shared that "the Sprint/T-Mobile merger could be back on" and that their role would "be to reach out to the Vice President's staff" about the merger. A104-105. At trial, Copher could not "recall the specific date of that conversation," A104, but he

---

[3] The government provided Copher immunity in exchange for his testimony. A127.

16

previously told the government it occurred at some point *after* April 6, 2018.  A136.

Copher also testified about an exchange he had with Mr. Buyer concerning Guidehouse in June or July 2019.  A112.  After breakfast one day, Copher testified, Mr. Buyer told him something to the effect of, "I think Guidehouse needs to or should or will buy somebody.  I've got it narrowed down to two or three."  A112.

Copher further testified about an exchange he had with Stansbury in June 2019.  Stansbury asked Copher whether Mr. Buyer had "figured it out yet."  A113.  When Copher asked what Stansbury meant, Stansbury responded:  "Your partner thinks we are, we should, we're gonna, we need to buy somebody."  A113.  After this exchange with Stansbury, Copher texted Mr. Buyer:  "Who do you think Guidehouse is trying to buy?"  A113-114.  Mr. Buyer didn't respond.  A115.

***Anthony Russo***.  At trial, Russo recounted his golf trip with Mr. Buyer as well as his work on the T-Mobile/Sprint merger.  But Russo did not "remember exactly what date [he] first talked to … Buyer about the merger."  A149.  In fact, he "d[id] not have a specific memory" of *ever* "telling … Buyer that the talks were back on," in Florida or

17

elsewhere. A174, 203. The government thus tried to prove its case inferentially, through an April 3, 2018 email in which Russo responded to an inquiry from T-Mobile's general counsel about a different consultant, Manus Cooney, by stating "our core group is aware" of the merger:

From: Russo, Anthony (DC)
Sent: Tuesday, April 3, 2018 6:52 PM
To: Ham, Kathleen <Kathleen.Ham@t-mobile.com>
Cc: Miller, Dave (Legal) <Dave.Miller@T-Mobile.com>
Subject: Re: is manus back and fully engaged??

Yes, our core group is aware and once we get further messaging etc. we will be excepting a very focused strategy for the Hill and the Administration.

Sent from my iPhone

On Apr 3, 2018, at 6:29 PM, Ham, Kathleen <Kathleen.Ham@t-mobile.com> wrote:

He is as are other lobbyists that will be key.

From: Miller, Dave (Legal)
Sent: Tuesday, April 3, 2018 6:15 PM
To: Russo, Anthony (DC) <Tony.Russo@T-Mobile.com>; Ham, Kathleen <Kathleen.Ham@t-mobile.com>
Subject: is manus back and fully engaged??

A532; *see also* A162.

The government coupled that email with trial testimony from Russo that his "core group" of consultants included Mr. Buyer, as well as Cooney, Chris Putala, Henry Waxman, Billy Tauzin, and John Sununu. A147, 162. Despite his lack of recollection of ever telling Mr. Buyer about the merger, Russo was adamant at trial that his April 3 email accurately stated he had informed his "core group." *E.g.*, A201-

18

202. But Russo later admitted that, in fact, *not* all members of his group were aware of the merger by April 3; for example, despite Russo emailing "core group" member Sununu that he would be in touch about "a big development," the two did not connect until April 14. A191-192, 198. And as explored at trial, the government's prior interview notes indicate that Russo provided inconsistent accounts before trial about who exactly was in this "core group." A187-189.

***Jessica Volchko***. The government also called FBI digital forensic examiner Jessica Volchko as a lay witness to testify about a forensic analysis of Stansbury's cellphone conducted by the FBI using software produced by a company called Cellebrite (the "Cellebrite Report"). A293-313. But Volchko was not the FBI analyst who performed the Cellebrite analysis of Stansbury's phone or created the Cellebrite Report. A308-309. She was a "last-minute substitute" for that analyst (Shane Duda), who left the FBI shortly before trial for undisclosed reasons. A305, 309.

Volchko described Cellebrite as software that FBI digital forensic examiners "use to extract data from mobile devices, and then analyze that data and generate a report." A307. Duda created the Cellebrite

19

Report on January 30, 2023. A309. Volchko did not herself conduct the analysis, nor was she present when it was conducted; she merely "received a copy [of the report] from the case agent" shortly before trial. A308, 320.

At trial, Volchko opined "[t]hat the report [she] reviewed is a report of [Stansbury's] phone that was collected," basing her testimony on a collection form filled out during Stansbury's Guidehouse interview in 2019, when his phone was imaged. *Supra* 15; A307. Volchko then testified about the contents of the Cellebrite Report, which was admitted into evidence in its entirety. A308-310, 312, 654-656. For example, she testified about an excerpt of the Cellebrite Report showing a "cookie" from Navigant.com. A309, 653. Volchko explained: "Cookies are basically small text files" that "indicate websites that were visited or advertisements that were" visited by a device. A309. According to Volchko, the Cellebrite Report indicated that Stansbury's cellphone accessed Navigant.com on June 20, 2019. A309.

Volchko then discussed an excerpt of the Cellebrite Report showing the "P-list file" on Stansbury's phone, with an entry entitled "RestoreStateInfo" from June 13, 2019. A309-310, 656. "RestoreState"

20

refers to "restor[ing] your device to a backup." A310. Thus, Volchko testified that Stansbury's phone was restored on June 13, 2019. A310. Volchko explained that restoring a device reverts the device to how it existed at the time the most recent backup file was generated; any data generated in the intervening time is "erased from the phone." A310.

*Venue*. The government called three witnesses to testify about venue, a hotly disputed element in the case.

The government first called a witness from Two Sigma Securities, a "wholesale" broker-dealer headquartered in Manhattan offering "execution services" to its clients—generally retail brokers like Charles Schwab. A295. This witness testified regarding Mr. Buyer's Navigant trades. A296. He explained that Two Sigma receives orders from its clients (here, Schwab) "electronically" on computer "servers in a data center," and those orders are "processed through algorithms that make decisions as to what to do with that order." A295. The entire process is "automated," occurring "without any human beings being involved at all." A297-298. Mr. Buyer's Navigant trades "were processed at [Two Sigma's] data center in New Jersey," and "no human being intervened [in the] transaction." A298.

21

The government next called a witness from Virtu, another broker-dealer headquartered in Manhattan providing wholesale execution services. A298. The Virtu witness testified about Mr. Buyer's Sprint trades, which Virtu received from Schwab. A299, 560. Virtu's "computers … doing the order execution" were "housed" in "a data center in Secaucus, New Jersey." A299. Mr. Buyer's trades were executed "automatically through [Virtu's] computer system," A300, without any human "intervention," A301. Consequently, "[t]he execution of th[ose] trades happened in New Jersey." A301.[4]

The government's final venue witness was from the Depository Trust and Clearing Corporation (DTCC), which clears and settles trades in securities.[5] A321-322. DTCC "operate[s] two data centers: One … in lower Manhattan, and one at the Brooklyn Army Terminal." A321. Each data center contains "a large server," and as "transactions come

---

[4] Virtu also has a data center in Purchase, New York. A299. The servers in New Jersey "execute the orders, and … [the order] goes to [Virtu's] back office systems [in Purchase], and then those back office systems interact with [other entities] for settlement." A299.

[5] "Clearance refers to the post-execution reporting and recording of trades." *United States v. Chow*, 993 F.3d 125, 134 (2d Cir. 2021). "Settlement is the process by which money is exchanged for the transfer of the securities." *Id.*

22

into [DTCC], … they're load balanced between these two machines.  So based on volume and timing, they go through one of the two machines." A321; *see also* A322 ("[A]n algorithm processes the data in one of the two locations depending on what's most efficient.").  In sum, "sometimes [trades] come into Manhattan," "sometimes they come into Brooklyn," and—importantly—there is "no way of knowing" where a particular trade cleared or settled.  A322.  After clearance and settlement, transaction data "then is written to storage, primary storage in Brooklyn, secondary storage [in Manhattan]," "in a synchronous way," so "the data writes at the same time in both [Manhattan] and Brooklyn."  A321.

*The Defense Case*.  After the close of the government's evidence, Mr. Buyer presented his defense case.  Eight character witnesses testified for the defense, including two major generals, two former congressmen (one a Democrat and one a Republican), and a retired justice of the Indiana Supreme Court.  A365-384.  Mr. Buyer then testified in his own defense, explaining that he legally purchased Sprint and Navigant shares based on his own extensive research.  A402-484.

23

Mr. Buyer testified that he kept written "watch lists" of stocks to trade. A419. He put Sprint on his watchlist in mid-February 2018, after seeing that Softbank, which had an ownership interest in Sprint, was purchasing massive amounts of Sprint stock daily. A427-428. Mr. Buyer believed Softbank's investment in Sprint to be a sign that Softbank viewed "their stock as undervalued," A428, possibly because Sprint was going to pursue a new merger partner after merger negotiations with T-Mobile fell apart at the end of 2017. A428; *supra* 8.

Around the end of March, Sprint's stock was approaching Mr. Buyer's target price, as was another stock on Buyer's watch list (Tellurian). A432-433. So before leaving for Florida, Mr. Buyer deposited $115,000 in various of his Charles Schwab investment accounts. A432-433; *supra* 7. On March 29 (while in Florida), he made an initial investment in both Sprint and Tellurian. A433. Once back in Indiana, he considered further investments and printed out a Zacks report on Sprint, on which he made handwritten notes reflecting his thoughts on Sprint's potential merger partners. A429-431, 433; A739-741 (Zacks printout dated April 2, 2018). As the stock price continued to rise, he bought more shares of Sprint stock on April 3 and 5 as a risk-

24

management strategy, consistent with investment advice he had received from his father in the past. A414, 433 (discussing 2000 Investor's Business Daily article); *supra* 6.

Mr. Buyer testified that he had no inside information about any possible merger between Sprint and T-Mobile at the time he traded. A467. Instead, he learned of the merger for the first time on April 10, 2018, when he met with Russo in person at T-Mobile's D.C. offices and Russo asked for his assistance liaising with Vice President Pence. A439-441.

Turning to the Guidehouse trades, Mr. Buyer recounted his interactions with Stansbury on June 12, 2019 to get "the latest numbers on VA rev cycle" in response to Stansbury's request. A449. Stansbury had requested similar information before (in 2016), and the request did not suggest anything about a merger. A449. Mr. Buyer obtained the requested information and sent it to Stansbury. *Supra* 12-13.

Mr. Buyer then explained how he came to trade in Navigant stock. He thought Guidehouse should consider acquiring Huron, another healthcare consulting company that Mr. Buyer was familiar with from prior consulting work, and mentioned that possibility to Stansbury

25

when they spoke on June 12, 2019. A448. While looking up information about Huron later that night, he came across Navigant's name on a list of healthcare consulting companies. A451-452. He looked up Navigant on Schwab's website and saw the Zacks recommendation to buy, A452-454; *supra* 13, as well as other market indicators favoring a stock purchase, A413-416, 453-454, 755 (discussing "cup and handle" pattern). Mr. Buyer first purchased shares of Navigant on June 13, 2019, and continued buying additional shares "over the summer," buying "into the upward momentum of the stock to reduce risk" as his father had taught him. A455.

Mr. Buyer testified that he did not have any inside information when he bought Navigant stock. A447. Stansbury did not read him Harkness's email or mention anything about a "combination" or "synergies." A450-451. Although Mr. Buyer suspected Guidehouse might acquire another consulting firm, that suspicion was based not on inside information, but the fact that Guidehouse was owned by a private equity firm known for "follow-on acquisitions." A457. As for Mr. Buyer's Signal message to Stansbury, Mr. Buyer explained that Stansbury had introduced him to Signal, which many people in

26

government used. A464. Mr. Buyer sent this message because he "wanted to look [Stansbury] in the eyes" when he told him the truth about what happened. A464.

At the conclusion of trial, the jury convicted Mr. Buyer on all counts. A528. The district court sentenced him principally to 22 months' imprisonment. SPA10. Mr. Buyer will begin serving his sentence on January 9, 2024.

## SUMMARY OF THE ARGUMENT

**I.** The government's circumstantial insider-trading case relied heavily on the Cellebrite Report, a digital forensic analysis of a Guidehouse employee's iPhone. But the FBI analyst who testified at trial, Jessica Volchko, was not the person who performed the analysis. That kind of "surrogate testimony" violates the Confrontation Clause. And because the analyst who performed the Cellebrite Report did not testify, the report was also inadequately authenticated; no testimony proved that it was an accurate, authentic, and unaltered extraction of data from the phone in question. Further, the government did not disclose Volchko as an expert, instead calling her as a lay witness—but

27

her testimony impermissibly rested on her technical training and specialized knowledge.

The Confrontation Clause violation warrants a new trial because the government cannot prove that the error was harmless beyond a reasonable doubt. The Cellebrite Report was central to the government's assertion that Mr. Buyer learned about Guidehouse's impending acquisition of Navigant in June 2019 through his consulting work. And while that evidence was specific to Mr. Buyer's Navigant trades, the error generated prejudicial spillover requiring a new trial on all counts.

**II.** The government did not meet its burden of proving that venue was proper in SDNY. It could not establish that Mr. Buyer's trades executed, cleared, *or* settled in SDNY. It instead sought to demonstrate SDNY venue based on the facts that the NYSE and certain brokerage firms are *headquartered* in Manhattan, and that certain trading records are *stored* in Manhattan after a transaction's completion. But those facts are irrelevant to the constitutional and statutory venue inquiry, and Mr. Buyer is accordingly entitled to a new trial on all counts in a district where venue is proper.

28

**III.** The government lacked any direct evidence that Mr. Buyer possessed MNPI at the time of his trades, and its circumstantial evidence left the jury with nothing more than speculation and conjecture as a basis to convict. As for the Sprint trades, the T-Mobile employee alleged to have told Mr. Buyer about the merger talks before Mr. Buyer's stock purchases specifically disclaimed any recollection of sharing that information at that time. Similarly, the Guidehouse employee who allegedly learned about the Navigant acquisition and then passed that information on to Mr. Buyer did not testify at trial at all. The government could not prove that the Navigant employee even possessed the MNPI in question, much less passed it along to Mr. Buyer. The government thus invited the jury to convict based on speculation, arguing that the timing of Mr. Buyer's trades couldn't be an innocent coincidence. But suspicion and speculation do not form a legally sufficient basis for a conviction.

## STANDARD OF REVIEW

This Court reviews questions of law de novo. *Hall v. United States*, 58 F.4th 55, 59-60 (2d Cir. 2023). Mr. Buyer's Confrontation Clause, venue, and sufficiency challenges are all legal questions

29

reviewed de novo. *See United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009) (Confrontation Clause); *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (venue); *United States v. Khalil*, 857 F.3d 137, 139 (2d Cir. 2017) (sufficiency). His authentication and Federal Rule of Evidence 701(c) challenges are reviewed for abuse of discretion. *See United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015).

With respect to a sufficiency challenge, the question on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). If not, the conviction must be reversed.

## ARGUMENT

## I.   The District Court Erred In Admitting The Cellebrite Report And Volchko's Surrogate Testimony.

The government introduced at trial a digital forensic analysis—the Cellebrite Report—conducted by an analyst who left the FBI for unknown reasons prior to trial and did not testify. The government instead called a surrogate witness, Volchko, to testify about the report's contents. The district court committed reversible error by admitting

that testimony and the Cellebrite Report itself. The Constitution and the Federal Rules of Evidence do not allow a surrogate witness to introduce, interpret, or summarize a forensic analysis conducted by someone else.

### A. Admission of the Cellebrite Report through Volchko's surrogate testimony violated Mr. Buyer's Confrontation Clause rights.

#### 1. The Cellebrite Report is testimonial.

As "[o]ne of the bedrock constitutional protections afforded to criminal defendants," *Hemphill v. New York*, 595 U.S. 140, 150 (2022), the Sixth Amendment's Confrontation Clause guarantees a defendant the right to confront (i.e., cross-examine) "those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004).

The Confrontation Clause's protections are not limited to live testimony; documents constitute "testimonial evidence" if they are "created solely for an 'evidentiary purpose'" and "made in aid of a police investigation"—even if not in the form of a sworn affidavit or certification. *Bullcoming*, 564 U.S. at 664 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009)). A defendant has a right to cross-examine the witness who prepared such a document. *Id.* at 652.

31

*Bullcoming* makes clear that the Cellebrite Report is testimonial. It was indisputably created solely for an evidentiary purpose, in aid of a police investigation. That ends the inquiry.

The fact that an FBI analyst used computer software to generate the Cellebrite Report does not strip the Report of its testimonial character. Indeed, the prosecution made precisely that argument in *Bullcoming* (about a blood-alcohol-concentration result generated by a gas chromatograph machine)—and the Supreme Court rejected it. "The obvious reliability of a testimonial statement does not dispense with the Confrontation Clause," and so "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar." *Id.* at 661 (cleaned up). Thus, this Court has correctly understood *Bullcoming* to clearly establish "that forensic reports—even those prepared by analysts who purportedly act as 'mere scrivener[s]' of machine-generated results—are testimonial statements." *Garlick v. Lee*, 1 F.4th 122, 131 (2d Cir. 2021). That rule applies squarely here and renders the Cellebrite Report testimonial.

32

Moreover, *Bullcoming* explained, the analyst's role in preparing a forensic report generally goes beyond that of a "mere scrivener." 564 U.S. at 659-60. Such reports make "representations[] relating to past events and human actions not revealed in raw, machine-produced data." *Id*. at 660. In *Bullcoming*, for example, the analyst's report made representations related to the accuracy and authenticity of his analysis, including "that he received [the] blood sample intact with the seal unbroken" and that he performed a "particular test, adhering to a precise protocol." *Id.* at 660. That is also true of the forensic analysis here, where the analyst (Duda) represented that he in fact performed the specific analysis in question on the date in question on the identified device with properly functioning Cellebrite software—and did not simply fabricate the results. A654.

### 2. The government's reliance on surrogate testimony does not cure the Confrontation Clause violation.

Although the Cellebrite Report is testimonial, the district court nonetheless found no Confrontation Clause violation because Mr. Buyer was able to cross-examine *Volchko*, who was familiar with Cellebrite

software but did not herself perform the analysis of Stansbury's cellphone. A74.

The district court's conclusion is irreconcilable with *Bullcoming*. There, the government sought to introduce a forensic blood-alcohol analysis—but it did not call the analyst who performed the testing (who was on leave). 564 U.S. at 651. Instead, it called "another analyst who was familiar with the laboratory's testing procedures." *Id.* The Supreme Court held that when the prosecution introduces a forensic report, the analyst who prepared that report becomes the witness whom the defendant has a Sixth Amendment right to confront—a right that is not satisfied by cross-examining a "substitute" or "surrogate" witness. *Id.* at 652, 663. The Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id.* at 662.

The reason for this rule is, in part, practical. "[S]urrogate testimony" like that here "could not convey what [the testing analyst] knew or observed about the [relevant] events …, *i.e.*, the particular test and testing process he employed." *Id.* at 661. "Nor could such

34

surrogate testimony expose any lapses or lies on the [testing] analyst's part." *Id.* at 661-62. Here, for example, Volchko's surrogate testimony could not expose any missteps or fabrications on Duda's part in analyzing Stansbury's cellphone. And only with Duda "on the stand" "could [Mr. Buyer] have asked questions designed to reveal whether incompetence, evasiveness, or dishonesty accounted for" Duda's leaving his job with the FBI. *Id.* at 662.

*Bullcoming*'s prohibition on "surrogate" testimony also flows directly from the Sixth Amendment's plain terms. As *Bullcoming* explained, "the text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." *Id.* at 662 (alteration omitted). Courts are not free to substitute their own judgment about what suffices to protect the Confrontation Clause's "underlying values" for the Clause's clear text. *See id.*; *Hemphill*, 595 U.S. at 152-53; *Crawford*, 541 U.S. at 61-62.

Despite these clear principles, the district court appeared to believe that Volchko's availability for cross-examination was sufficient to satisfy the Confrontation Clause because she offered her own independent opinion about the Cellebrite Report. A74-75 (citing *United*

35

*States v. Landji*, No. 18-cr-601, 2022 WL 2334509, at *21 (S.D.N.Y. June 27, 2022)). But even if Volchko's testimony could be understood as recounting her independent conclusions about the Cellebrite Report rather than simply parroting the contents of someone else's report (*but see infra* 43-44), it still does not comply with the Sixth Amendment. Neither the Supreme Court nor this Court has ever endorsed any "independent opinion" exception to the Confrontation Clause.[6] *Cf. Ryan v. Miller*, 303 F.3d 231, 248-249 (2d Cir. 2002) (the government "may not circumvent the Confrontation Clause by introducing the same substantive testimony in a different form"). But even if such an exception were to exist, Volchko's testimony would not satisfy it, as Volchko was not purporting to testify as an expert and her testimony had no evidentiary value other than for its truth. *See infra* 41, 44; *Stuart v. Alabama*, 139 S. Ct. 36, 37 (2018) (Gorsuch, J., dissenting from denial of certiorari).

---

[6] The Supreme Court granted certiorari on the validity of that exception in *Smith v. Arizona*, No. 22-899, 2023 WL 6319655 (U.S. Sept. 29, 2023), which has been set for argument on January 10, 2024.

### 3. Mr. Buyer preserved his Confrontation Clause challenge.

Mr. Buyer expressly preserved his Confrontation Clause objection and this Court should review the issue de novo. *But see* Dkt. 17 ¶ 22 (government's bail opposition) (inaccurately contending that Mr. Buyer "did not raise" his Confrontation Clause objection "at trial" and urging plain-error review).

The record makes clear that Mr. Buyer "fairly alert[ed] the court and opposing counsel to the nature of" his objection, which preserves the error for review. *United States v. Rodriguez-Gonzalez*, 899 F.2d 177, 180 (2d Cir. 1990); *see* Fed. R. Crim. P. 51(b), 52(b). Before Volchko took the stand, the defense objected, explaining that Volchko was "a last-minute substitute for a previous witness that the government was going to call." A305. The district court allowed Volchko to testify, but specifically invited the parties to submit supplemental briefing challenging her testimony and the Cellebrite Report's admission by 8:00 p.m. that same day. A306, 340. Per the district court's instruction, the defense filed a motion to strike Volchko's testimony and the Cellebrite Report as violative of the Confrontation Clause, improperly authenticated, and impermissible expert testimony from a lay witness.

37

A58-59.  On the Confrontation Clause issue, Mr. Buyer argued

specifically that Volchko's surrogate testimony violated *Bullcoming*.

A59.

In short, any contention that Mr. Buyer forfeited this argument

would be meritless.  At any rate, the district court's blatant

misapplication of *Bullcoming* was an "obvious" error, *supra* 31-36,

affecting Mr. Buyer's substantial rights, *infra* 45-48, and thus satisfies

the standard for plain error, were it to apply.  *See United States v.*

*Olano*, 507 U.S. 725, 734 (1993).

## B.    The government failed to authenticate the Cellebrite Report.

The admission of the Cellebrite Report was reversible error twice

over:  In addition to violating Mr. Buyer's Confrontation Clause rights,

it was also improperly authenticated.  Indeed, the government's

defenses to the Confrontation Clause objection, which emphasize the

lack of any formal certification, only underscore its inadequate

authentication.

Before any evidence is admitted, "the proponent must produce

evidence sufficient to support a finding that the item is what the

proponent claims it is."  Fed. R. Evid. 901(a).  The touchstones of the

38

authentication inquiry are "authenticity and accuracy." *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991). The purpose of the authentication inquiry is to prove it "'improbable that the original item ha[s] been exchanged with another or otherwise tampered with.'" *United States v. Grant*, 967 F.2d 81, 83 (2d Cir. 1992).

Applying these principles, courts have routinely found that authenticating a forensic report requires some kind of testimony from the testing analyst. *See, e.g.*, *United States v. Hajbeh*, 565 F. Supp. 3d 773, 775-77 (E.D. Va. 2021) (testimony from the analyst who ran a Cellebrite report was necessary to authenticate the report); *cf. Bullcoming*, 564 U.S. at 660 (describing analyst's certification of accuracy and authenticity of results). The government did not introduce any such testimony here.

Instead, it claimed the Cellebrite Report was authenticated because the "IMEI" number on the top of the report (basically, a "serial number" that "uniquely identifies [a] mobile device," A307) is the same as the IMEI number from Stansbury's phone, as documented on a form filled out when Guidehouse's in-house counsel collected Stansbury's phone during their internal investigation. A306. The district court

39

agreed. A74. But the fact that the IMEI number of the phone collected from Stansbury is written at the top of the Cellebrite Report does not prove the *Report* is what it purports to be—an accurate, complete, and untampered extraction of information from Stansbury's actual phone—any more than the presence of someone's social security number at the top of a blood-alcohol analysis report proves the forensic analyst tested the right sample and did not tamper with the results. *Cf. Bullcoming*, 564 U.S. at 652-55.

The government's argument appears to confuse authenticating *Stansbury's phone* with authenticating *the Cellebrite Report*. Whether Duda had the correct phone in his possession does not speak to "authenticity" or "accuracy" of the analysis Duda conducted, *Ruggiero*, 928 F.2d at 1303, nor does it prove it "improbable" that the *Report* (as opposed to the phone) was "tampered with," *Grant*, 967 F.2d at 83. Without hearing from Duda himself about "the process of extraction," *Hajbeh*, 565 F. Supp. 3d at 777, there was no information whatsoever as to the integrity of the Cellebrite Report. This concern is particularly acute because Duda left the FBI for unknown reasons shortly before trial. *Cf. Bullcoming*, 564 U.S. at 655 (relevant analyst on unpaid leave

40

for unknown reasons). And it is further heightened because Duda performed a "logical extraction"—a partial extraction of the phone—rather than a full "bit-by-bit" copy. A316, 654; *cf. United States v. Ganias*, 824 F.3d 199, 215 (2d Cir. 2016) (because "the extraction of specific data files to some other medium can alter, omit, or even destroy portions of the information contained in the original storage medium," "a complete mirror may ... be necessary" to "authenticate [an extraction] at trial"). As a result, the district court abused its discretion in admitting the unauthenticated Cellebrite Report.

## C. Volchko's lay witness testimony improperly applied her specialized knowledge.

When the government called Volchko as "a last-minute substitute" for Duda, it claimed Volchko was testifying as "a lay witness," A305—presumably because the government had not provided the required expert notice for Volchko's testimony. *See* Fed. R. Crim. P. 16(a)(1)(G). Volchko's testimony was not permissible testimony from a lay witness, and the district court abused its discretion in admitting it.

A witness's testimony can be admitted as lay testimony only if it is "the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d. Cir.

41

2005). Federal Rule of Evidence 701(c) forbids the admission of purported lay testimony that "rests in any way upon scientific, technical, or other specialized knowledge." *United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013). The purpose of this limitation on lay testimony "is to prevent a party from … conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony … and the pre-trial disclosure requirements." *Garcia*, 413 F.3d at 215-17.

In essence, Rule 701(c) prevents circumventing the rules and required disclosures governing expert testimony: exactly what the government did here. Volchko's opinion was plainly based on her specialized training and experience, in violation of Rule 701(c); she openly admitted as much on the witness stand. A316 (discussing how her "specialized knowledge" and "training" allows her "[t]o process digital evidence and analyze that evidence"). Unsurprisingly, then, her testimony was "hardly that of an average person." *Garcia*, 413 F.3d at 216. Her testimony included the following explanations:

- What a "cookie" is, how a cookie gets saved to a phone, and why cookies end up on a phone. A309.

42

- What a "P-list" is, as well as the meaning of the "RestoreStateInfo" reference in the "P-list" file. A309-310.

- Whether and how messages from applications that use encryption, like Signal, can be recovered. A312.

Volchko herself agreed that "the average person on the street" would not understand many of the terms used in the Cellebrite Report and her testimony. A316. She has a degree in Digital Forensics, has served for over seven years as a digital forensic examiner for the FBI, and has taken between 10 and 15 specialized courses in digital forensics. A316. The idea that her testimony was based on "reasoning processes familiar to the average person in everyday life" strains credulity. *Garcia*, 413 F.3d at 215-17 (finding that FBI agent's testimony reflected his "considerable specialized training and experience" and was not permissible lay opinion); *Haynes*, 729 F.3d at 195 (similar).

This Court has acknowledged that, in some circumstances, fact witnesses involved in the events of the case may testify as lay witnesses even though they happen to have specialized knowledge. *See United States v. Rigas*, 490 F.3d 208, 222-23 (2d Cir. 2007). Put differently, otherwise permissible testimony about a witness's personal involvement

43

in the events of the case need not be excluded simply because the witness has specialized knowledge. Even if law-enforcement officer testimony can sometimes fall within this exception, *but see Garcia*, 413 F.3d at 215-17; *Haynes*, 729 F.3d at 195, the facts here bear no resemblance to that scenario. Volchko had no basis to offer independent "investigatory findings and conclusions." *Rigas*, 490 F.3d at 224 (quoting *Bank of China v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004)). She was not involved in the case until one week before trial and she did not conduct any investigation or analysis of her own; she simply reviewed excerpts of someone else's report (identified to her by the case agent and U.S. Attorney's Office) and parroted those at trial.[7] As a result, her testimony was "not a product of [her own] investigation, but rather reflected specialized knowledge [s]he has because of [her] extensive experience" in digital forensic analysis—making it impermissible under Rule 701(c). *Bank of China*, 359 F.3d at 182.

---

[7] That fact sets this case apart from *United States v. Marsh*, where an FBI agent testified as a lay witness about Cellebrite analyses *he personally conducted*. 568 F. App'x 15, 17 (2d Cir. 2014) (summary order).

44

**D.    The error in admitting Volchko's testimony and the Cellebrite Report was not harmless beyond a reasonable doubt.**

Admitting Volchko's testimony and the Cellebrite Report in violation of the Confrontation Clause requires a new trial unless the government can prove *beyond a reasonable doubt* that the error was harmless. *United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007).[8]  It cannot meet that heavy burden.

A key question at trial was whether Mr. Buyer had MNPI when he purchased Navigant shares.  The government's evidence on this point was underwhelming.  *Infra* 67-74.  For the Navigant trades, the person who supposedly told Buyer about the potential acquisition— Stansbury—did not testify at all, and Guidehouse's internal investigation concluded no Guidehouse employees shared MNPI with Buyer.  *Supra* 10-17; *infra* 67-74.  So the government was left to fill in glaring gaps in its case with speculation and innuendo.  *Infra* 67-74.

---

[8] For non-constitutional errors, a new trial is required unless there is "fair assurance that the evidence did not substantially influence the jury."  *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (quotation marks omitted).  This standard is met for the reasons detailed below.

A critical piece of this gap-filling attempt was the Cellebrite Report. As discussed further below (*infra* 67-72), Stansbury's alleged knowledge of Guidehouse's bid to acquire Navigant was the linchpin of those charges: If Stansbury did not know about the potential acquisition on June 12, 2019, then he could not have passed that information to Mr. Buyer in advance of Mr. Buyer's June 13, 2019 Navigant trades. The only person who could have given Stansbury the information—Alicia Harkness—testified that she did not. Thus, the government's theory rested on speculation that Stansbury somehow deduced the potential acquisition from a cryptic email Harkness sent him. *Infra* 67-72. And the Cellebrite Report was virtually the *only* evidence the government introduced to show Stansbury somehow understood the email in the way it claimed.

The Cellebrite Report and Volchko's testimony thus featured heavily in the government's closing to bolster its case. For example, the government emphasized that "a cookie from Stansbury's phone" showed a visit to the Navigant website on June 20, 2019, and argued that this cookie demonstrated Stansbury knew about the potential acquisition before the announcement. A491, 507. The government also cited the

46

Cellebrite Report-derived evidence of Stansbury's phone being restored on June 13, 2019 to argue Stansbury "knew he had done something wrong" and "tr[ied] to cover it up." A491. These two pieces of evidence, both drawn from the Cellebrite Report, constituted the complete universe of evidence from June 2019 the government cited as establishing that Stansbury must have deduced the possibility of an acquisition from Harkness's email. Without this evidence, the government would have no case.[9]

Although the evidence admitted through Volchko's testimony was specific to the Navigant trades, her improperly admitted testimony requires reversal on the Sprint counts too. The district court ruled before trial that the government could use evidence on the Navigant counts "as direct evidence" on the Sprint counts, and vice versa. A48. The government took full advantage of this ruling at trial. For example, it emphasized in rebuttal that Mr. Buyer repeatedly "buying massive quantities of stock within 24 hours of talking to someone with material nonpublic information about that stock" "wasn't a coincidence."

---

[9] Even with this evidence, the government's case was legally insufficient to convict Mr. Buyer. *Infra* 67-74.

A504. From the fact that "[i]t happened with Sprint" and "then it happened again a year later" with Navigant, the government told the jury it was "common sense" that Mr. Buyer was guilty of both schemes. A504.

Because the government portrayed the Navigant and Sprint trading as mutually reinforcing schemes, dramatically weakening the Navigant case also dramatically weakens the Sprint case. This prejudicial spillover requires a new trial on *all* counts. *Cf. United States v. Bentvena*, 319 F.2d 916, 949, 955 (2d Cir. 1963) (wrongfully admitted evidence as to one count required reversal as to other counts); *United States v. Smith*, 520 F.2d 1245, 1248 (8th Cir. 1975) (erroneous admission of prejudicial hearsay "permeate[d] the entire case" and required reversal on all counts); *United States v. Eason*, 920 F.2d 731, 737 (11th Cir. 1990) (similar).

## II. The Government Failed To Prove Venue Was Proper.

Venue in a criminal case "present[s] policy concerns deeply rooted in the constitution." *United States v. Fortenberry*, ___ F.4th ___, 2023 WL 8885105, at *3 (9th Cir. Dec. 26, 2023) (reversing conviction for improper venue). Prosecutors are not entitled to select whatever venue

48

they prefer based on "convenience." *See id.* at *7. Instead, the Sixth Amendment guarantees the right to a jury trial in the "district wherein the crime shall have been committed." Similarly, under the general criminal venue provision, venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). And under the venue provision specific to the Securities Exchange Act, venue in a securities-fraud case is proper in any district "wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa(a). The government has the burden of proving venue by a preponderance of the evidence. *See United States v. Svoboda*, 347 F.3d 471, 485 (2d Cir. 2003).

Mr. Buyer placed his trades from outside SDNY, and none of the meetings, conversations, or communications featured at trial took place in SDNY. This Court's precedent holds that venue in an insider-trading case is appropriate for trades placed from outside SDNY if those trades are *executed* in SDNY. Here, however, Mr. Buyer's trades indisputably executed in New Jersey. Some cases have suggested (albeit in dicta) that SDNY venue can be established through evidence that trades cleared or settled in SDNY. But the government could not prove Mr.

49

Buyer's trades cleared, *or* settled in SDNY, either. It instead sought to establish SDNY venue based on the facts that the New York Stock Exchange and certain brokerage firms are *headquartered* in Manhattan, and that certain trading records are stored in Manhattan after a transaction's completion. Such evidence is insufficient as a matter of law to establish venue, and Mr. Buyer is accordingly entitled to a new trial on all counts in Indiana or another district where venue is proper. *See Smith v. United States,* 599 U.S. 236, 243 (2023).

### A. The New York Stock Exchange's physical headquarters does not establish SDNY venue over trades not executed in SDNY.

The government's principal argument for venue, ultimately adopted by the district court, was that Sprint and Navigant stocks are traded "on the New York Stock Exchange [NYSE] which is headquartered in Manhattan." SPA3. The contention that the NYSE's physical headquarters in Manhattan establishes venue over every insider-trading case involving NYSE-traded stock is wrong and rests on a misinterpretation of this Court's precedents.

Two decades ago, this Court concluded that "the execution of trades on [NYSE] … is sufficient to establish venue in [SDNY]," because

50

(as the Court repeatedly emphasized) such trades are "executed *in* [SDNY]." *Svoboda*, 347 F.3d at 483-84 & n.13 (emphasis added). At the time, trading on the NYSE took place on a physical trading floor in Manhattan. *See* NYSE, *The History of NYSE*, https://tinyurl.com/bdek8z6b (last visited Jan. 2, 2024); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 92 (2d Cir. 2007) (describing role of NYSE "specialists" who used to execute "purchases and sales of … [e]ach security listed … on the NYSE" from "trading post[s]" on the physical trading floor). That is why *Svoboda* repeatedly equated execution occurring "on" the NYSE with execution occurring "in" SDNY. *Svoboda*, 347 F.3d at 483-84 & n.13.

Today, however, NYSE trades are not necessarily executed at a trading post on the NYSE trading floor. They are executed electronically on computer servers that could be located anywhere. Here, for example, Mr. Buyer's Sprint and Navigant trades indisputably executed on computer servers located *in New Jersey*. A298, 301. Thus, in this era of electronic trading, the fact that the NYSE's physical headquarters is in SDNY is not sufficient to resolve the question of where a defendant's "crime shall have been committed," U.S. Const.

51

amend. VI, or where the "act or transaction constituting the violation occurred," 15 U.S.C. § 78aa(a).

This Court recognized as much in *United States v. Chow*, 993 F.3d 125 (2d Cir. 2021). At issue in *Chow* was "stock … traded on the NASDAQ, which is headquartered in Manhattan." *Id*. at 133. But that was the beginning—not the end—of the venue inquiry. This Court described in detail how the trades at issue were carried out, *id*. at 133-34, 143, and specifically concluded that the defendant's trades were, in fact, "executed" in SDNY, *id*. at 143. Having concluded that the defendant's trades executed in SDNY, the Court determined the defendant's venue challenge was "foreclosed by the established law of this Circuit." *Id*.

*Chow* cited three cases as representing "the established law of this Circuit" on the relevant venue principles: *Svoboda*, 347 F.3d at 483; *United States v. Geibel*, 369 F.3d 682, 687 (2d Cir. 2004); and *United States v. Riley*, 638 F. App'x 56, 62 (2d Cir. 2016) (summary order). All three cases involved trades executed on a trading floor *in* SDNY—and the outcome of all three cases turned on that fact. *Svoboda* involved NYSE and American Stock Exchange (AMEX) stocks traded between

52

1994 to 1997, well before trading moved off the physical trading floor. 347 F.3d at 475; *supra* 21-22, 51. And *Svoboda* expressly linked its venue ruling to the fact that trades executed "on" the NYSE and AMEX "executed *in* [SDNY]." 347 F.3d at 483-84 & n.13 (emphasis added). In *Geibel*, this Court found venue *improper* on "the majority of the insider trading counts" charged, because with respect to those counts the defendants did not "utilize[] *the facilities* of any New York-based securities exchange." 369 F.3d at 697 (emphasis added). It affirmed the handful of counts related to trades "executed 'on [AMEX]'" in 1997 and 1998, however—clearly because those trades *did* "utilize[] the facilities of [a] New York-based securities exchange," i.e., the trades executed on the exchange floor. *Id*. at 697-98; *cf. Svoboda*, 347 F.3d at 483-84. Finally, in *United States v. Riley*, the government presented evidence that "the execution, settlement, and clearing of [the] trades" at issue all occurred "over servers located in [SDNY]." Br. for the United States, *United States v. Riley*, No. 15-1541 (Oct. 26, 2015), 2015 WL 6522453, at *55. This Court accordingly held venue proper because the "trading … occur[red] *in* [SDNY]." 638 F. App'x at 62 (emphasis added).

53

In sum, cases like *Svoboda*, *Geibel*, and *Chow* hold that venue in an insider-trading case is proper in SDNY when the relevant trades execute *in* SDNY. This Court has never held that a stock exchange's headquarters in SDNY is sufficient to establish venue in an insider-trading case when the relevant trades did not execute in SDNY. Nor would there be any basis in the relevant constitutional or statutory language for such a holding, because the location of the NYSE's physical headquarters has no bearing on where the crime of insider trading is "committed" or where the relevant transaction "occurred" in the modern era.

### B. The government did not prove that Mr. Buyer's trades cleared or settled in SDNY.

This Court has at times suggested that clearance and settlement of trades in SDNY may be sufficient to establish venue for trades executed outside SDNY, although none of its holdings ultimately turned on that question. *See Chow*, 993 F.3d at 133-34, 143; *United States v. Khalupsky*, 5 F.4th 279, 291 (2d Cir. 2021). Even assuming that the place of clearance and settlement can establish venue, the government did not prove that clearance and settlement of Mr. Buyer's trades took place in SDNY.

54

The clearing and settlement processes are managed by the DTCC. *Chow*, 993 F.3d at 134. Here, the DTCC witness testified that DTCC "operated two data centers" to "clear and settle trades," one located in Manhattan (in SDNY) and one in Brooklyn (in EDNY). A321. As "transactions come into [the system] … they're load balanced between these two machines," "[s]o based on volume and timing, they go through one of these two machines." A321. In other words, "an algorithm processes the data in one of the two locations depending on what's most efficient" at a particular time. A322. There is "no way of knowing which" server processed a given transaction. A322. As a result, the DTCC witness could not say which server handled clearing or settlement for Mr. Buyer's trades. A322. Thus, the government failed to prove that clearing or settlement of Mr. Buyer's trades occurred in SDNY, even under the applicable preponderance standard.

## C. None of the government's other venue evidence was sufficient to establish SDNY venue.

Unable to prove facts that could establish venue under this Court's precedents, the government and the district court pointed to a grab-bag of other purported connections to SDNY. None of these assorted connections proves venue.

55

***Brokerage firm headquarters***.  As the district court and the government emphasized, the brokerage firms Schwab used to execute Mr. Buyer's stock purchases were headquartered in Manhattan.  *E.g.*, SPA4; A493-494.  To be clear:  There was no human broker in Manhattan executing Mr. Buyer's trades.  The trial testimony was that his trades executed on computer servers in New Jersey automatically, "without any human beings being involved at all."  A297-298; A301 (similar).  The alleged SDNY connection is simply the brokerage firms' corporate headquarters.

The facts of this case are accordingly nothing like *Chow*, where this Court invoked the location of the defendants' broker as one factor supporting venue in SDNY.  993 F.3d at 133-34, 143.  There, the Court did not rely on the mere fact that the brokerage firm's corporate headquarters was located in SDNY; it explained that the broker had actually provided services at its Manhattan headquarters in furtherance of the transactions it executed.  *Id*.  The record here, by contrast, makes clear that the brokerage firms' corporate headquarters played no role whatsoever in the relevant transactions.  *Supra* 21-22.

Neither the district court nor the government has ever explained how a brokerage firm's corporate headquarters establishes where an offense was committed for venue purposes. Mr. Buyer's trades were executed on brokers' computer servers in New Jersey. Whether the brokerage has its corporate headquarters in Manhattan or Boston changes nothing about the transaction. A broker's headquarters does not "*constitute* the securities fraud violation," as this Court has held the "acts or transactions" giving rise to venue in a securities-fraud case must do. *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016).

**Post-transaction storage**. The government also pointed to post-execution record storage in Manhattan as a basis for venue in SDNY. After the DTCC clears and settles a transaction on either its Manhattan or Brooklyn server, *supra* 22-23, the data "then is written to storage, primary storage in Brooklyn, [and] secondary storage [in Manhattan]." A321. This is "done in a synchronous way," so "the data writes at the same time in both [Manhattan] and Brooklyn." A321.

That the DTCC writes a duplicate copy of all transaction data to secondary storage in Manhattan after execution, clearance, and settlement does not establish venue. The act of storing transaction data

57

is distinct from the transaction itself, and data storage plainly does not "*constitute* the securities fraud violation." *Lange*, 834 F.3d at 69. Nor is secondary storage of duplicate records "foreseeable" to a defendant. *Svoboda*, 347 F.3d at 483. The logical consequences of the government's argument show the absurdity of its position: Under the government's theory, venue in every insider-trading case would lie in Maine if the NYSE decided to ship a duplicate copy of all transaction records there for storage. That "would be an odd and troubling result," and cannot be right. *Fortenberry*, 2023 WL 8885105, at *6.

***Virtu Westchester data center.*** Finally, the government and the district court seized on the fact that one of the brokers at issue (Virtu) has a data center in Purchase, New York, located within SDNY. A299. As a threshold matter, this data center is relevant only to the Sprint counts, A299, and so cannot prove venue with respect to the Navigant counts. Moreover, the Sprint trades did not execute, settle, or clear in Purchase. *Supra* 22. What the Virtu witness explained is that *after* execution, New Jersey computer servers send the transaction data to the Purchase data center, where Virtu's "back office systems interact with [DTCC] for settlement." A299. In essence, the Purchase data

58

center is an intermediary stop through which transaction data passes on its way from Virtu's New Jersey servers to DTCC's Manhattan or Brooklyn servers, after execution but before clearance and settlement. That the transaction data takes a brief (and seemingly unnecessary) detour through Purchase does not establish venue in SDNY because it does not show that the offense was committed or the transaction occurred there. *Cf. Tzolov*, 642 F.3d at 318 (defendants' travel through EDNY "on their way to meet [defrauded] investors" did not give rise to venue in securities-fraud case).

## III.  The Evidence Was Legally Insufficient To Convict Mr. Buyer.

In this insider-trading prosecution, the government had the burden to prove that Mr. Buyer "received … material, nonpublic information" and "used th[at] information to trade relevant securities." *United States v. Contorinis*, 692 F.3d 136, 141 (2d Cir. 2012).  This case is unusual in that even after a two-week trial, there were striking gaps in the record as to what MNPI Mr. Buyer allegedly possessed at the time of the challenged trades.  Mr. Buyer was accused of trading on MNPI he obtained from Russo and Stansbury—but Russo didn't remember telling Mr. Buyer the MNPI in question, and Stansbury

59

didn't testify at all.  So the government openly invited the jury to convict based on speculation and conjecture.  In essence, the government rested on its submission that Mr. Buyer's trading in companies that his consulting clients eventually acquired couldn't be an innocent coincidence and must therefore be fraudulent.  Never mind that Mr. Buyer had an impeccable reputation for honesty and integrity developed over decades of public service, and no reason to throw that all away for relatively modest trading profits at a time of tremendous professional and financial success.  According to the government, the fact that Mr. Buyer traded at all was proof enough that his trading was fraudulent.  That is a legally insufficient basis for a criminal conviction.

## A.    The evidence was legally insufficient to convict Mr. Buyer for his purchases of Sprint stock.

With respect to the Sprint counts, the government claimed Mr. Buyer obtained MNPI about T-Mobile's impending merger with Sprint from Russo during a golf trip from March 28 to March 30, 2018, and used that information to buy Sprint stock on March 29, April 3, and April 5, 2018.  *Supra* 6-10, 17-19.  Given the government's theory, it is striking that Russo never actually testified to telling Mr. Buyer about the merger on their golf trip.  To the contrary, he had no memory of that

60

crucial fact. At trial, Russo said he did not "remember exactly what date [he] first talked to … Buyer about the merger." A149. In fact, he "d[id] not have a specific memory of" *ever* "telling … Buyer that the [merger] talks were back on," whether during the golf trip in Florida or thereafter. A174. And although T-Mobile kept meticulous records about who was "under the tent" with knowledge of the merger, A177-178, 197, those records do not show Mr. Buyer learning about the merger until April 18, 2018, when he signed a nondisclosure agreement. A168.

That was a significant problem for the government. It is undisputed that Russo *at some point* told Mr. Buyer about the impending T-Mobile/Sprint merger. Mr. Buyer testified that Russo told him about the merger on April 10, he signed an NDA on April 18, and he worked on the merger as a consultant. *Supra* 10. But the government's case turned on Russo telling Mr. Buyer about the merger in late March or early April—i.e., *before* Mr. Buyer's March 29, April 3, and April 5 trades in Sprint stock—rather than on April 10, 2018. If Russo didn't remember when he told Mr. Buyer about the merger, how

could the government prove *beyond a reasonable doubt* that Mr. Buyer purchased Sprint stock based on MNPI?

The government tried to get around that problem by relying on a syllogism: (1) that Russo told his "core group" about the merger by April 3 based on an email from Russo to T-Mobile's general counsel, Dave Miller, described above (*supra* 18) and reproduced below, and (2) that Mr. Buyer was in his "core group."  A147, 162, 488, 504.

**From:** Russo, Anthony (DC)
**Sent:** Tuesday, April 3, 2018 6:52 PM
**To:** Ham, Kathleen <Kathleen.Ham@t-mobile.com>
**Cc:** Miller, Dave (Legal) <Dave.Miller@T-Mobile.com>
**Subject:** Re: is manus back and fully engaged??

Yes, our core group is aware and once we get further messaging etc. we will be excepting a very focused strategy for the Hill and the Administration.

Sent from my iPhone

On Apr 3, 2018, at 6:29 PM, Ham, Kathleen <Kathleen.Ham@t-mobile.com> wrote:

He is as are other lobbyists that will be key.

**From:** Miller, Dave (Legal)
**Sent:** Tuesday, April 3, 2018 6:15 PM
**To:** Russo, Anthony (DC) <Tony.Russo@T-Mobile.com>; Ham, Kathleen <Kathleen.Ham@t-mobile.com>
**Subject:** is manus back and fully engaged??

A532.  This syllogism does nothing to prove that Mr. Buyer had MNPI *five days before* Russo's email, when he first traded in Sprint stock on March 29.  And as other parts of the trial record made clear, neither premise of the government's theory holds up to even minimal scrutiny, let alone suffices to eliminate reasonable doubt.

62

First, as noted above, *supra* 19, Russo provided inconsistent accounts over time as to who was in his "core group." A187-189. When confronted with this inconsistency at trial, he simply maintained that the FBI case agent's notes on this critical question were inaccurate. *E.g.*, A188.

Further, Russo was demonstrably wrong when he defended the accuracy of his email to T-Mobile's general counsel that his entire "core group [wa]s aware" of the merger by April 3. At trial, Russo testified that this "core group" included former Senator John Sununu. *Supra* 19. But the documentary evidence proves Russo did not reach Sununu to update him about the merger until April 14. *Supra* 19; A191-192. The fact that Russo's April 3 email is demonstrably inaccurate severely limits the weight any rational juror could have placed on it.

Indeed, Russo's testimony revealed that it would have been unusual for Mr. Buyer to have learned of the merger talks directly from Russo himself. Russo admitted at trial that "the first person" from T-Mobile to reach out to Mr. Buyer about the merger would "likely" have been Adam Peterman, Mr. Buyer's direct supervisor. A197. There was no evidence, however, that Peterman told Buyer about the merger prior

63

to April 3, when Russo sent his "core group" email, or that Russo knew of such outreach (had it occurred). A197. Nor could Russo reconcile his testimony about Peterman's role with his disavowal of relying on any "assumptions" in writing his April 3 email to T-Mobile's general counsel. A202. At most, what Russo's April 3 email shows is a miscommunication or incorrect assumption about whether and when Mr. Buyer was informed of the merger, hardly surprising given the hectic nature of Russo's communications during that time.

Without any non-speculative evidence establishing when or how Russo told Mr. Buyer about the merger, the government's argument boils down to this: Russo *must* have somehow told Mr. Buyer about the Sprint merger on the golf trip, despite lacking any memory or written record of having done so, because Mr. Buyer first purchased Sprint stock while on that trip. Indeed, that's the closing argument the government made to the jury. *E.g.*, A486 (Russo "obviously" told Mr. Buyer about the merger "on the golf trip … because Mr. Buyer started trading on day two"). This kind of "pure speculation" and "guesswork" is legally insufficient to sustain a conviction. *United States v. Thai*, 29 F.3d 785, 818-19 (2d Cir. 1994).

64

It bears noting that even "*reasonable* speculation" is insufficient to support a conviction, because "it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Pauling*, 924 F.3d 649, 662 (2d Cir. 2019) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (first emphasis added)); *cf. Langston v. Smith*, 630 F.3d 310, 319 (2d Cir. 2011) (citing cases "distinguishing between 'reasonable speculation' and 'sufficient evidence'"). But the government's speculation here is not even reasonable, because Russo's account of his Florida trip does not suggest any obvious opportunity for Russo to have shared MNPI with Buyer. Recall that trip was Russo's *family vacation*. Russo and Mr. Buyer weren't staying at the same location; Russo and his family were staying at their condo in Miami, while Mr. Buyer stayed at the Doral resort. A186. While the two golfed together on several occasions—the government's principal focus at trial—they never did so alone; Russo and Mr. Buyer golfed once with Russo's father, and another time with Russo's father and son. *Supra* 7-8. Although Russo's father was also a T-Mobile consultant, Russo testified that his father learned about the merger much later, A163, so it would appear Russo and Mr. Buyer did

65

not discuss the merger on the golf course. This is reaffirmed by the fact that Russo didn't remember his father and Mr. Buyer discussing the merger on the trip, A187, as they surely would have done if all three had been read in on the details. Plus, there is the inconvenient fact that Mr. Buyer deposited some $115,000 in his Schwab investment accounts on March 26, 2018, before he left for Florida and before he could possibly have received any MNPI from Russo on the golf trip. *Supra* 7.

A juror might well find it suspicious that Mr. Buyer purchased Sprint stock close in time to when merger talks had restarted. But "suspicion falls short of proof beyond reasonable doubt," *United States v. Heithaus*, 391 F.2d 810, 811 (3d Cir. 1968), and "[s]uspicious circumstances" are accordingly a legally insufficient basis for conviction, *United States v. Nusraty*, 867 F.2d 759, 763-64 (2d Cir. 1989) (reversing conspiracy conviction). The government has not produced any *evidence* from which a jury could reasonably conclude beyond a reasonable doubt that Mr. Buyer purchased Sprint stock based on MNPI. It cannot get around that deficiency by claiming common sense proves Mr. Buyer must be guilty. *Cf. United States v. Taylor*, 816 F.3d 12, 26 (2d Cir.

66

2016) (reversing structuring conviction because there was no basis to infer fraudulent intent as opposed to "coincidence").

## B. The evidence was legally insufficient to convict Mr. Buyer for his purchases of Navigant stock.

With respect to the Navigant counts, the government claimed Mr. Buyer obtained MNPI about a potential acquisition from Stansbury on June 12, 2019, and used that information to buy Navigant stock starting the next day. *Supra* 16-20. But the government didn't call Stansbury as a witness. Given that significant gap in its proof, the government had to somehow demonstrate circumstantially that Mr. Buyer traded on MNPI he somehow obtained from Stansbury. To do that, the government had to show first that Stansbury *himself* possessed MNPI, and second that Stansbury passed that MNPI along to Mr. Buyer. Failure of proof at either step of this inferential chain requires reversal of Mr. Buyer's conviction, and the government at both steps offers nothing more than speculation. That is legally insufficient to convict.

***Step One***. The government failed, first, to prove Stansbury possessed any MNPI about Guidehouse's possible acquisition of Navigant, and the government's case fails for this reason alone.

67

Guidehouse records showed Stansbury was *not* among the employees told about the company's potential bid to acquire Navigant. A229. While Alicia Harkness asked Stansbury for information related to that bid, *supra* 11-12, she did not tell Stansbury what the information was for. A213-214. The government does not dispute either of these facts. Instead, it seizes on the email Harkness sent Stansbury with her information request, pasted directly from the Veritas email Harkness received. A213-214, 545; *see supra* 11-12. The email read:

| Message | |
|---|---|
| From: | Alicia K Harkness [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5D8111D2FD4D4ABF8728894EFC649D8F-AHARKNESS] |
| Sent: | 6/12/2019 9:44:49 PM |
| To: | Christopher Stansbury [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a3718125a1bb456b81c5f20bad95fa6d-cstansbury] |
| Subject: | Help? [INTERNAL USE ONLY] |

numbers to show the**total addressable market opportunity,** rather than run-rate revenue opportunity? So for example – we are currently showing a $1 million revenue synergy for RCM work at the VA. In reality, the total opportunity for RCM work at VA could be $[500] million (I'm making up a placeholder number here).

Of course, this estimate of "market potential" will be preliminary and not underwritten into any internal forecast. However, the goal of this exercise is to demonstrate a significant addressable market that is unlocked through this combination

A545.

This email is the linchpin of the government's case. The Navigant counts turn on the government's contention that Stansbury somehow

68

deduced the fact of a potential acquisition on his own from the contents of the email—specifically, the cryptic, unexplained language lifted from Veritas's inquiry about "revenue synergy" and a "combination." But no reasonable juror could conclude as much from the Harkness email.

For one thing, even *Harkness*—a Guidehouse partner with substantial expertise in healthcare consulting—"didn't entirely know precisely what [the email] meant initially" when she received it. A211. In particular, Harkness was not familiar with the term "synergy" referenced in that email when she started working on the potential bid for Navigant. A211. If Harkness—a partner who *knew* Guidehouse was pursuing an acquisition—didn't know this term connoted a possible acquisition, it is entirely implausible to conclude that Stansbury, a lower-level sales director who saw the email cold without any context, must have immediately understood what it meant.

Even if Stansbury had immediately picked up—and understood— that Guidehouse was interested in "synergies" attributable to a "combination" related to "RCM work at the VA," that would not tell Stansbury that Guidehouse was contemplating *acquiring* anyone (much less Navigant). Harkness testified about other—much more common—

69

forms of "combination" in the consulting world. For example, she explained that Guidehouse sometimes "entered into what are called joint ventures," "when two or more companies combine to do a particular job" over a "longer term relationship." A227. As relevant here, some of Guidehouse's joint ventures have been "VA related." A227. Relatedly, Harkness testified about "[t]eaming agreements," where two companies work together "for a specific engagement opportunity" on a shorter time horizon in government contracting. A227.

Simply put, there is no *evidentiary basis* to conclude that Stansbury would have understood Harkness's email at all, much less understood it to refer to a potential acquisition specifically rather than more common forms of consulting "combination." The jury could reach that conclusion only through impermissible "speculation" and "guesswork." *Thai*, 29 F.3d at 818-19. The mere *possibility* that Stansbury pieced together the context underlying Harkness's email is insufficient to convict Mr. Buyer because, as explained above, "it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *Pauling*, 924 F.3d at 662 (quoting *Lorenzo*, 534 F.3d

70

at 159); *cf. Langston*, 630 F.3d at 319 ("sufficient evidence" is a higher bar than "reasonable speculation").

Moreover, even if the government had proved that Stansbury suspected that Harkness's email was referring to a potential bid to acquire another company (even though the message itself said no such thing), no reasonable investor would have treated the contextless sentence fragments in Harkness's message as sufficiently specific and reliable to "undertak[e] a substantial economic risk" based on its contents. *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979). After all, to qualify as MNPI, information must be "material," and to be material, the government must prove that a reasonable investor would consider the information to be significant. *United States v. Cusimano*, 123 F.3d 83, 88 (2d Cir. 1997) (material information "significantly alter[s] the 'total mix' of information available"); *Contorinis*, 692 F.3d at 143 (material information is information that "a reasonable investor would find it important in making an investment decision"). In the context of a potential corporate transaction, "[t]he mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material." *Glazer v. Formica Corp.*,

71

964 F. 2d 149, 155 (2d Cir. 1992); *see United States v. Mylett*, 97 F.3d 663, 666 (2d Cir. 1996) (to be material, information must be "specific"). Harkness's email, "by any standard, lacked the basic elements of specificity" required to support a materiality finding. *Monarch Fund*, 608 F.2d at 942.

***Step Two***.  Even if Stansbury possessed MNPI, the government failed to prove the second necessary step of its circumstantial case— that Stansbury passed that MNPI along to Mr. Buyer.  This is hardly a radical conclusion:  It was the conclusion of Schulte, Roth & Zabel LLP, who conducted an extensive internal investigation including interviews with Harkness and Stansbury and told the government "there was no evidence that Guidehouse employees shared material nonpublic information with Buyer."  A259.  Although Stansbury and Mr. Buyer spoke on the phone the evening of June 12, 2019, there is no evidence whatsoever that Stansbury shared MNPI with Mr. Buyer on that call.

So the government resorted to a few isolated exchanges over the following months to justify its speculation that Stansbury told Mr. Buyer Guidehouse was interested in acquiring Navigant.  For example, it cited a June 2019 conversation between Stansbury and Copher (Mr.

72

Buyer's business partner) where Stansbury asked Copher: "[H]as he figured it out yet?" referring to Mr. Buyer. A113. This exchange doesn't suggest that Stansbury told Mr. Buyer about a potential acquisition. Indeed, Stansbury told Copher during that conversation that Stansbury "wouldn't be read in" on any potential acquisition talks. A113. It is thus fully consistent with testimony from Copher and Mr. Buyer that Mr. Buyer *himself* deduced the possibility that Guidehouse was considering an acquisition (of healthcare consulting company Huron, not Navigant) from public information: Guidehouse's private-equity ownership. *Supra* 25. The insider-trading laws do not prohibit investors from transacting in stocks based on their "educated guesses or predictions." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc).

The government also points to Mr. Buyer's Signal message to Stansbury, A548, but nothing in the content of the message suggests Stansbury shared MNPI with Mr. Buyer and the mere fact of communicating on Signal is not evidence of guilt. *See, e.g.*, A319-320 (government witness admitting she uses Signal herself, as do "many upstanding citizens"). Evidence like this that gives, at most, "equal or

73

nearly equal circumstantial support to a theory of guilt [as] a theory of innocence" is insufficient to sustain a conviction. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quotation marks omitted).[10]

The only "evidence" the government is left with is the fact that Mr. Buyer traded in Navigant stock the day after talking to Stansbury.[11]  That's not evidence at all; it's suspicion, and "suspicion falls short of proof beyond reasonable doubt," *Heithaus*, 391 F.2d at 811.

---

[10] The district court relied heavily on an additional piece of evidence: that Copher told Mr. Buyer in June 2019, "whatever you're thinking about doing, you probably shouldn't do it."  SPA6 (quoting A115).  The district court misunderstood Copher's testimony, which had nothing to do with trading in Navigant.  Copher explained he was "concern[ed] … that [Mr. Buyer] … was going to call [their former client Huron] back up and try and re-pitch them," despite potential conflicts with their Guidehouse work.  A115.  Copher's concern about Mr. Buyer pitching Huron does not tend to prove that Mr. Buyer is guilty of insider trading.

[11] At trial, the government pointed to (erroneously admitted) evidence that Stansbury restored his phone on June 13, 2019 as evidence that Stansbury shared MNPI with Mr. Buyer.  A491; *supra* 46-47.  But the government conceded to this Court that such evidence carries little weight because "people restore their phones from back-ups for many reasons."  Dkt. 17 ¶ 31 (government's bail opposition).  And it is clear there was no incriminating evidence on Stansbury's phone to delete, as the government obtained all relevant text messages and call records from June 12, 2019 from Mr. Buyer's phone.  A318-319, 330.

74

## CONCLUSION

Mr. Buyer's convictions should be reversed, or alternatively vacated and the case remanded for a new trial in a district where venue is proper.

Dated: January 5, 2024                    Respectfully submitted,

/s/ Daniel A. Rubens
Daniel A. Rubens
Daniel R. Alonso
Alyssa Barnard-Yanni
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Elizabeth A. Bixby
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Second Circuit Local Rule 32.1(a)(4) because this brief contains 13,842 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Daniel A. Rubens*
Daniel A. Rubens
*Counsel for Defendant-Appellant*

# SPECIAL APPENDIX INDEX

Decision & Order
Dkt. 98, filed March 14, 2023.................................................................SPA1

Judgment
Dkt. 170, filed September 19, 2023......................................................SPA8

Amended Judgment
Dkt. 186, filed November 7, 2023 .......................................................SPA17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
UNITED STATES OF AMERICA,
                        Government,

        -against-

STEPHEN BUYER,
                        Defendant.
------------------------------------------------------------X

22 CR. 397 (RMB)

<u>**DECISION & ORDER**</u>

### I.    Background

On March 8, 2023, the Court reserved decision with respect to the Defense motion to

dismiss following the close of the Government's case. <u>See</u> Fed. R. Crim. P. 29(b) ("The

court may reserve decision on the motion, proceed with the trial (where the motion is made

before the close of all the evidence), submit the case to the jury, and decide the motion either

before the jury returns a verdict or after it returns a verdict of guilty or is discharged without

having returned a verdict.")  The Government opposed the defense motion. <u>See</u> Trial

Transcript, dated March 7, 2023 at 1117:25-1118:1 (AUSA: "On venue . . . the evidence is

that all of these trades took place on the New York Stock Exchange."); <u>Id</u>. at 1116:6-10

(AUSA: [With respect to the substantive counts] "Mr. Russo [T-Mobile Vice President for

Federal Legislative Affairs] testified that he made his core group aware by April 3rd, at the

latest.  He testified that Mr. Buyer was in the "core" group.  So the testimony is clear from

Mr. Russo that by April 3rd, Mr. Buyer is read into the merger.  He trades April 5th."); <u>Id</u>. at

1116:24-25-1117:1-12 (AUSA: "On June 12th, there's that email . . . Government Exhibit

210.  Alicia Harkness [Partner, Guidehouse], who was under the tent on the merger, sends an

email to Mr. Stansbury [Sales Leader at Guidehouse], where it makes clear a "combination"

is happening . . . Sixteen minutes later, Mr. Stansbury calls Mr. Buyer, and they have a call . .

1

**SPA1**

. They exchange texts throughout the night. And then they have a seven-minute call later. And then after midnight that night, Mr. Buyer starts researching Navigant on the Schwab web page. The next morning, he starts trading in Navigant. And his trades are incredibly substantial. $28,000 - - or 28,000 shares of Navigant, I think it's over $600,000 worth of Navigant purchased that day, a stock he's never purchased before.")

At the time the motion was made, the Court stated that it would rule on the motion following the jury verdict in this case. The Court also advised the parties that if it were to decide the motion (on March 8th), it would deny the motion with respect to both venue as well as the four substantive counts in the Indictment. See Trial Transcript, dated March 8, 2023 at 1247:3-8 (COURT: "I'm reserving decision on that motion, [i.e.] the defense motion under Rule 29 to dismiss focusing on venue and the substantive counts. [As] a heads up, were I to rule today, it would likely be that I would deny the motion at this stage on both venue and the substantive challenges . . .So [D]ecision [R]eserved.").[1]

## II.    Legal Standard

When resolving a motion under Rule 29(a), the Court is required to view the evidence "in the light most favorable to the government" and to draw all reasonable inferences in the government's favor. United States v. Autouri, 212 F.3d 105, 114 (2d Cir. 2000). If the Court reserves decision on a Rule 29(a) motion, "it must decide the motion on the basis of the evidence

---

[1] And, on March 9, 2023, the Court similarly reserved decision until after the jury's verdict with respect to the defense's "renewed motion to dismiss". See Trial Transcript, dated March 9, 2023 at 1692:20-25, 1693:1-5 (DEFENSE COUNSEL ALONSO: "I looked up while during the summation your Rule 29 deferral. You had said that you were deferring, and that if you were to rule, you would likely deny. You never did rule. I don't know if you were saying deferring until after a potential guilty verdict or until now." COURT: "I thought I said that too. Maybe not, but that's my intention." DEFENSE COUNSEL ALONSO: "In light of the government's summation, we renew it now." COURT: "Okay. Fair enough. Same response from me.")

at the time the ruling was reserved." <u>United States v. Truman</u>, 688 F.3d 129, 139 (2d Cir. 2012) (internal citation omitted).

"The test established by the Supreme Court requires [the trial court] to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Temple</u>, 447 F. 3d 130, 136 (2d Cir. 2006) (internal citation and quotations omitted).

With respect to venue, Fed. R. Crim. P. 18 provides that the Government must prosecute an offense in a district where the offense was committed. "[E]xecution of trades on the New York Stock Exchange and American Stock Exchange is sufficient to establish venue in the Southern District of New York." <u>United States v. Svoboda</u>, 347 F. 3d 471, 484 (2d Cir. 2003)

## III.    Analysis

Following the jury's March 10, 2023 verdict of guilty on all counts in the Indictment, the Court rules as follows on the Defense motion to dismiss made on March 7, 2023 and renewed on March 9, 2023.[2]

### <u>Venue</u>

The venue requirement was readily met by the Government  - - and by a preponderance of the evidence.  Venue was established because, among other things, the Defendant's trades took place on the New York Stock Exchange which is headquartered in Manhattan.  <u>See</u> Trial Transcript dated March 3, 2023 at 725: 2-7 (AUSA: "Mr. Carocci, you mentioned the New York Stock Exchange earlier, what is that?" THOMAS CAROCCI: "So that is an exchange where

---

[2] The parties also made written submissions each dated March 7, 2023 with respect to the Defense motion following the close of the Government's case.

publicly traded companies' stock, the shares of stocks, are traded amongst investors." AUSA: "Where is the New York Stock Exchange headquartered?" THOMAS CAROCCI: "New York, Manhattan."); see also Trial Transcript dated March 6, 2023 at 854-862 (Matthew Levine, employed by Virtu Financial a financial services company headquartered in Manhattan, New York, with data centers located, among other places, in Purchase, New York. Mr. Levine had testified that Virtu executed purchases orders for both Sprint in 2018 and for Navigant ("NCI") in 2019.). Carl Vallese, employed by Two Sigma Securities, a broker dealer company, located in Manhattan, New York testified that in 2019, Two Sigma had executed trades involving Navigant. See Trial Transcript dated March 6, 2023 at 842-850.

### **Securities Fraud (Insider Trading)– Counts One through Four**

With regard the substantive securities counts - - in the light most favorable to the government - - and at the close of the Government's case, the Court found the following:

1- The evidence presented in the Government's case in chief included that Defendant's trades in Sprint and Navigant securities, respectively, were "timed" to occur before the public announcement of renewed merger talks between T-Mobile and Sprint, and before the public announcement of the acquisition by Guidehouse of Navigant. Sprint stock was purchased by the Defendant on or about March 29, 2018, April 3, 2018 and April 5, 2018. A public announcement of the proposed T-Mobile/Sprint merger was made on April 29, 2018. Similarly, Navigant stock was purchased by the Defendant on or about June 13, 2019, June 21, 2019, June 25, 2019, July 9, 2019, July 19, 2019, July 26, 2019

and August 1, 2019.  The public announcement of Guidehouse's acquisition of Navigant was made on or about August 2, 2019 (GX 700).[3]

2-  At the time of the stock purchases, Defendant had very significant consulting relationships with both T-Mobile and with Guidehouse.  His principal contact at T-Mobile was Anthony Russo, Vice President for Federal Legislative Affairs.  One of his key contacts at Guidehouse was Chris Stansbury, Sales Leader.  See Trial Transcript dated March 1, 2023 at 21-24 (AUSA: "So tell us in 2018 who was in this initial core group you described that you brought in in the initial stages [of the T-Mobile/Sprint merger]?"  ANTHONY RUSSO: "Manus Cooney, Chris Putala, **Steve Buyer**, Henry Waxman, Billy Tauzin and John Sununu.") (emphasis added); and Trial Transcript dated March 3, 2023 at 529:15-22 (AUSA: "And when you say he [Defendant] was a subcontractor for you, what do you mean?  What was he doing for you?" ALICIA HARKNESS, Partner, Guidehouse: "We had a monthly arrangement for him to provide advice and services for our firm."  AUSA: "When your say your firm, are you referring to PwC or Guidehouse?"  ALICIA HARKNESS: "Initially, PwC.  But then it transferred over to Guidehouse."  AUSA: "Who was Mr. Buyer's primary contact at Guidehouse?"  ALICIA HARKNESS: "Chis Stansbury was our primary point of contact with Mr. Buyer.")

3-  Defendant's first purchase of Sprint stock occurred on March 29, 2018, i.e., literally in between golf games which included Defendant, Anthony Russo, Mr. Russo's father and his son on March 28, 2018 and March 30, 2018.

---

[3] Sales of Sprint stock occurred on August 6, 2018 and August 7, 2018; and sales of Navigant stock occurred on August 2, 2019 and September 23, 2019.  Mr. Buyer's total profits were over $349,000.00

4- Defendant's initial purchase of Navigant stock came shortly after Chris Stansbury, Sales Leader at Guidehouse, received a June 12, 2019 email from Alicia Harkness, referencing "synergy" and "combination" (GX 210) and Chris Stansbury's June 12, 2019 telephone conversations and text messages with the Defendant.

5- The Defendant's business partner, and lifelong friend, Michael Copher, had dinner with Chris Stansbury (on June 19, 2019) at which Chris Stansbury asked: "has he [Defendant] figured it out yet?" (Trial Transcript dated March 1, 2023 at 115:19). And, when Copher soon after asked Stansbury what he was talking about, Stansbury advised Copher that "your partner [i.e. Defendant] thinks we are, we should, we're gonna, we need to buy somebody." Id. at 115:24-25. Thereafter, Copher texted the Defendant asking "Who do you think Guidehouse is trying to buy?" Id. at 119:13 and GX 401, 401A. Copher had a follow up conversation with Defendant Buyer in which he told Buyer **"[W]hatever you're thinking about doing, you probably shouldn't do it."** Id. at 124:11-12 (emphasis added).

6- Following Defendant's interview by attorneys for Guidehouse - - based upon a FINRA inquiry - - - Defendant sent a signal message to Chris Stansbury in which he stated: "I need to see you. Please . . . I will catch next flight. I was interviewed and told them I bought and I figured it was either Huron or Navigant on my own which is true and no one ever told me or uttered the word Navigant which is also true . . . I had seen Zach's research that recommend it around June 8 as a buy and had sent an [e]mail to my son about it . . . he never replied." (GX 406) This message was timed to "disappear" within 5 minutes of being sent.

6

**SPA6**

7- Defendant traded Sprint and Navigant stock across multiple accounts.  In at least one of these accounts which he controlled, Defendant traded only Sprint and Navigant stock.

## IV.    Conclusion

For the reasons stated above, the Rule 29 motion is denied.

Dated: New York, New York
       March 14, 2023

_____
RICHARD M. BERMAN, U.S.D.J.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case       (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT
Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>Stephen Buyer | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  22 cr 397<br>USM Number:  12536-510<br>Henry Asbill, Daniel Alonso, Olivia Rauh<br>Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   one through four
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 USC 78j(b) and 78ff,<br>17 CFR 240.10b-5,<br>18 USC 2 | securities fraud | 4/5/2018 | one |

    The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/19/2023
_____
Date of Imposition of Judgment

*RMB*

_____
Signature of Judge

Richard M. Berman, U.S.D.J.
_____
Name and Title of Judge

9/19/2023
_____
Date

USBC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/23

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

Judgment—Page   2   of   8

DEFENDANT:  Stephen Buyer
CASE NUMBER:  22 cr 397

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1348 and 2 | securities fraud | 4/5/2018 | two |
| 15 USC 78j(b) and 78ff, 17 CFR 240.10b-5, 18 USC 2 | securities fraud | 8/1/2019 | three |
| 18 USC 1348 and 2 | securities fraud | 8/2/2019 | four |

SPA9

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   3   of   8  

DEFENDANT:  Stephen Buyer
CASE NUMBER:  22 cr 397

## IMPRISONMENT

     The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of:
22 months on each count to run concurrently with one another.

☑   The court makes the following recommendations to the Bureau of Prisons:
    It is recommended that the defendant be designated to the Morgantown, West Virginia Camp facility.  It is also
    recommended that the defendant participate in a RDAP program, if he meets the criteria for entry into such a program.

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at  _____ ☐ a.m. ☐ p.m.  on  _____ .

    ☐   as notified by the United States Marshal.

☑   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑   before 2 p.m. on   11/28/2023       .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

    Defendant delivered on  _____ to  _____

at  _____ , with a certified copy of this judgment.

                                  _____

                                        UNITED STATES MARSHAL

                 By  _____

                              DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

|  |  | Judgment—Page | 4 | of | 8 |

DEFENDANT:   Stephen Buyer
CASE NUMBER:   22 cr 397

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years on each count to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from
     imprisonment and at least two periodic drug tests thereafter, as determined by the court.
          ☐ The above drug testing condition is suspended, based on the court's determination that you
               pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
     restitution. *(check if applicable)*
5.   ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
     directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
     reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

SPA11

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3D — Supervised Release

Judgment—Page   6   of   8

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## SPECIAL CONDITIONS OF SUPERVISION

1-Throughout the term of supervised release, defendant shall participate in weekly therapeutic counseling by a licensed therapist.  The defendant may be required to contribute to the costs of services rendered (copayment) in an amount to be determined by the probation officer, based on ability to pay or availability of third party payment.

2- Throughout the term of supervised release defendant shall participate in a program approved by the U.S. Probation Office for substance abuse which program shall include testing for the use of alcohol or or alcohol.  The defendant may be required to contribute to the costs of services rendered (copayment) in an amount to be determined by the probation officer, based on ability to pay or availability of third party payment;

3- Defendant shall submit his person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any law enforcement.  The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the defendant.  Failure to submit to a search may be grounds for revocation of release.  Defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  Any search shall be conducted at a reasonable time and in a reasonable manner.

4- Defendant shall not incur new credit charges or open additional lines of credit without the prior approval of the probation officer unless he is in compliance with his payment schedule;

5- Defendant shall provide probation with access to any requested financial information;

6- Defendant shall be supervised in his district of residence;

7- Defendant shall report to probation within 48 hours of release from custody;

8- Probation shall notify the Court immediately upon the defendant's release from custody and schedule a supervised release hearing with the Court within 30 days of the defendant's release from custody;

9- The terms of supervised release may not be modified without prior approval of the Court.

**SPA13**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | | Judgment — Page | 7 | of | 8 |

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 400.00 | $ | $ 10,000.00 | $ 0.00 | $ 0.00 |

☑   The determination of restitution is deferred until  11/7/2023 . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| T-Mobile - amount is deferred | | | |
| Guidehouse - amount is deferred | | | |

| TOTALS | $ 0.00 | $ 0.00 | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐   the interest requirement is waived for the   ☐  fine   ☐  restitution.

  ☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA14

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

| | Judgment — Page ___8___ of ___8___ |

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $ __400.00__   due immediately, balance due

      ☐   not later than _____ , or
      ☑   in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☑   Special instructions regarding the payment of criminal monetary penalties:
      If the def.is engaged in a BOP non-UNICOR work program, the def.shall pay $25 per quarter toward the criminal
      financial penalties. If the def. participates in the BOP's UNICOR program as a grade 1 through 4, the def.shall pay
      50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at
      28 C.F.R. § 545.11. If any portion of the financial penalties remain unpaid at the time of def.'s release from prison,
      they shall be paid in equal monthly installments.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☑   The defendant shall forfeit the defendant's interest in the following property to the United States:
$354,027.72 with credit for any money repaid by others in whose accounts the defendant traded.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

| | Judgment — Page | 8 | of | 8 |

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ __400.00__ due immediately, balance due

     ☑ not later than _____ , or
     ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☑ Special instructions regarding the payment of criminal monetary penalties:
     If the def.is engaged in a BOP non-UNICOR work program, the def.shall pay $25 per quarter toward the criminal
     financial penalties. If the def. participates in the BOP's UNICOR program as a grade 1 through 4, the def.shall pay
     50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at
     28 C.F.R. § 545.11. If any portion of the financial penalties remain unpaid at the time of def.'s release from prison,
     they shall be paid in equal monthly installments.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
$354,027.72 with credit for any money repaid by others in whose accounts the defendant traded.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245C (Rev. 02/18)    Amended Judgment in a Criminal Case                                                    (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT

### Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| Stephen Buyer | ) Case Number: 22 cr 397 |
| | ) USM Number: 12536-510 |
| **Date of Original Judgment:** ___9/19/2023___ | ) ___Henry Asbill and Olivia Rauh___ |
| *(Or Date of Last Amended Judgment)* | ) Defendant's Attorney |

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))
☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or
  ☐ 18 U.S.C. § 3559(c)(7)
☑ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**
☐ pleaded guilty to count(s) _____
☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.
☑ was found guilty on count(s) ___one through four___
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 USC 78j(b) and 78ff, | securities fraud | 4/5/2018 | one |
| 17 CFR 240.10b-5, | | | |
| 18 USC 2 | | | |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____
☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

___11/7/2023___
Date of Imposition of Judgment

*Richard M. Berman*

Signature of Judge
Richard M. Berman,                    U.S.D.J.
Name and Title of Judge

___11/7/2023___
Date

AO 245C (Rev. 02/18)    Amended Judgment in a Criminal Case
                        Sheet 1A

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __8__

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1348 and 2 | securities fraud | 4/5/2018 | two |
| 15 USC 78j(b) and 78ff, | securities fraud | 8/1/2019 | three |
| 17 CFR 240.10b-5, | | | |
| 18 USC 2 | | | |
| 18 USC 1348 and 2 | securities fraud | 8/2/2019 | four |

**SPA18**

AO 245C (Rev. 02/18)   Amended Judgment in a Criminal Case
           Sheet 2 — Imprisonment                                    (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___3___ of ___8___

DEFENDANT:  Stephen Buyer
CASE NUMBER:  22 cr 397

## IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

22 months on each count to run concurrently with one another.

☑    The court makes the following recommendations to the Bureau of Prisons:

It is recommended that the defendant be designated to the Morgantown, West Virginia Camp facility.  It is also recommended that the defendant participate in a RDAP program, if he meets the criteria for entry into such a program.

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____  ☐ a.m.  ☐ p.m.   on _____ .

    ☐  as notified by the United States Marshal.

☑    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑  before 2 p.m. on ___11/28/2023___ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**SPA19**

AO 245C (Rev. 02/18)    Amended Judgment in a Criminal Case
                Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

| Judgment—Page | 4 | of | 8 |
|---|---|---|---|

DEFENDANT:    Stephen Buyer
CASE NUMBER:    22 cr 397

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

three years on each count to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA20

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____          Date _____

**SPA21**

AO 245C (Rev. 02/18)   Amended Judgment in a Criminal Case
Sheet 3D — Supervised Release                                                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment—Page   6   of   8

DEFENDANT:  Stephen Buyer
CASE NUMBER:  22 cr 397

## SPECIAL CONDITIONS OF SUPERVISION

1-Throughout the term of supervised release, defendant shall participate in weekly therapeutic counseling by a licensed therapist.  The defendant may be required to contribute to the costs of services rendered (copayment) in an amount to be determined by the probation officer, based on ability to pay or availability of third party payment.

2- Throughout the term of supervised release defendant shall participate in a program approved by the U.S. Probation Office for substance abuse which program shall include testing for the use of alcohol or or alcohol.  The defendant may be required to contribute to the costs of services rendered (copayment) in an amount to be determined by the probation officer, based on ability to pay or availability of third party payment;

3- Defendant shall submit his person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any law enforcement.  The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the defendant.  Failure to submit to a search may be grounds for revocation of release.  Defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  Any search shall be conducted at a reasonable time and in a reasonable manner.

4- Defendant shall not incur new credit charges or open additional lines of credit without the prior approval of the probation officer unless he is in compliance with his payment schedule;

5- Defendant shall provide probation with access to any requested financial information;

6- Defendant shall be supervised in his district of residence;

7- Defendant shall report to probation within 48 hours of release from custody;

8- Probation shall notify the Court immediately upon the defendant's release from custody and schedule a supervised release hearing with the Court within 30 days of the defendant's release from custody;

9- The terms of supervised release may not be modified without prior approval of the Court.

AO 245C (Rev. 02/18)   Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties
(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __7__ of __8__

DEFENDANT:  Stephen Buyer
CASE NUMBER:  22 cr 397

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 400.00 | $ 0.00 | $ 10,000.00 | $ 765,912.61 * |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| *Clerk of Court, | * $430,108.16 | * $430,108.16 | 100% |
| United States District Court | | | |
| Southern District of New York | | | |
| New York, New York 10007 | | | |
| for the benefit of T-Mobile | | | |
| *Clerk of Court, | * $335,804.45 | * $335,804.45 | 100% |
| United States District Court | | | |
| Southern District of New York | | | |
| New York, New York 10007 | | | |
| for the benefit of Guidehouse | | | |
| TOTALS | $ * 765,912.61 | $ * 765,912.61 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

   ☐ the interest requirement is waived for   ☐ fine   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C (Rev. 02/18)    Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments                                      (NOTE: Identify Changes with Asterisks (*))

Judgment — Page __8__ of __8__

DEFENDANT: Stephen Buyer
CASE NUMBER: 22 cr 397

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☑  Lump sum payment of $ ___400.00___ due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:

    If the def. is engaged in a BOP non-UNICOR work program, the def. shall pay $25 per quarter toward the criminal financial penalties. If the def. participates in the BOP's UNICOR program as a grade 1 through 4, the def. shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11. If any portion of the financial penalties remain unpaid at the time of def.'s release from prison, they shall be paid in equal monthly installments.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:

    $354,027.72 with credit for any money repaid by others in whose accounts the defendant traded.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.