# 23-7202(L)

## 23-7745(CON)

*To Be Argued By*:
MARGARET GRAHAM

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket Nos. 23-7202(L), 23-7745(CON)

━━━━◆◆◆━━━━

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

STEPHEN BUYER, also known as Sealed Defendant 1,

*Defendant-Appellant.*

─────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

MARGARET GRAHAM,
JACOB R. FIDDELMAN,
  *Assistant United States Attorneys,*
    *Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Government's Case . . . . . . . . . . . . . . . 2

        1.  Buyer's Insider Trading in Sprint . . . . 4

        2.  Buyer's Insider Trading in Navigant . . 5

    B.  The Defense Case and Verdict . . . . . . . . . . 8

    C.  Buyer's Post-Trial Motions . . . . . . . . . . . . 8

    D.  Buyer's Sentencing and Motions for Bail Pending Appeal . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT:

POINT I—Sufficient Evidence Supported Buyer's Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 10

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 12

POINT II—The District Court Correctly Admitted Limited Portions of Stansbury's Cellphone Contents and Volchko's Testimony About Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 20

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 22

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii

PAGE

1. The Admission of Volchko's Testimony and Accompanying Exhibits Did Not Violate the Confrontation Clause . . . .  24

   a. Plain-Error Review Applies, and Buyer Has Failed to Satisfy Its Requirements . . . . . . . . . . . . . . . .  25

   b. There Was No Error, Plain or Otherwise, in Judge Berman's Decision Not to Strike Volchko's Testimony and Accompanying Exhibits . . . . . . . . . . . . . . . . . . . . .  27

2. There Was No Abuse of Discretion in the District Court's Conclusion that the Stansbury Phone Contents Were Sufficiently Authenticated . . . . . . . . .  32

3. There Was No Abuse of Discretion in the District Court's Conclusion that Volchko's Testimony Was Not Expert Opinion . . . . . . . . . . . . . . . . . . . . . . . .  34

4. Any Error Was Harmless . . . . . . . . . .  38

POINT III—The Jury and District Court Correctly Rejected Buyer's Venue Arguments . . . . . . . . .  40

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  41

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  42

iii

PAGE

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

## TABLE OF AUTHORITIES

*Cases:*

*Bullcoming v. New Mexico,*
    564 U.S. 647 (2011) . . . . . . . . . . . . . .  27, 28, 29, 33

*Garlick v. Lee,*
    1 F.4th 122 (2d Cir. 2021) . . . . . . . . . . . . . . . 28, 29

*Greer v. United States,*
    141 S. Ct. 2090 (2021) . . . . . . . . . . . . . .  23, 24, 27

*Melendez-Diaz v. Massachusetts,*
    557 U.S. 305 (2009) . . . . . . . . . . . . . . . . . . . . . . . 28

*Puckett v. United States,*
    556 U.S. 129 (2009) . . . . . . . . . . . . . . . . . . . . . 24, 27

*Ryan v. Miller,*
    303 F.3d 231 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 31

*Smith v. United States,*
    599 U.S. 236 (2023) . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Allah,*
    130 F.3d 33 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 44

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 11

iv

PAGE

*United States v. Avenatti*,
81 F.4th 171 (2d Cir. 2023) . . . . . . . . . . . . . 11, 17

*United States v. Avenatti*,
No. 19 Cr. 374 (JMF), Dkt. 381 (S.D.N.Y. Jan. 26,
2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Baker*,
899 F.3d 123 (2d Cir. 2018) . . . . . . . . . . . . . . . . 10

*United States v. Berry*,
318 F. App'x 569 (9th Cir. 2009) . . . . . . . . . . . . 36

*United States v. Botti*,
711 F.3d 299 (2d Cir. 2013) . . . . . . . . . . . . . . . . 26

*United States v. Capers*,
20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . 11, 19

*United States v. Check*,
582 F.2d 668 (2d Cir. 1978) . . . . . . . . . . . . . . . . 25

*United States v. Chow*,
993 F.3d 125 (2d Cir. 2021) . . . . . . . . . .   43, 45, 46

*United States v. Crowley*,
236 F.3d 104 (2d Cir. 2000) . . . . . . . . . . . . . . . . 26

*United States v. Cummings*,
858 F.3d 763 (2d Cir. 2017) . . . . . . . . . . . . . . . . 23

*United States v. Davis*,
689 F.3d 179 (2d Cir. 2012) . . . . . . . . . . . . . . . . 44

*United States v. Delva*,
858 F.3d 135 (2d Cir. 2017) . . . . . . . . . . . . . . . . 23

v

PAGE

*United States v. Dove*,
  884 F.3d 138 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 23

*United States v. Facen*,
  812 F.3d 280 (2d Cir. 2016) . . . . . . . . . . . . . 11, 19

*United States v. Florez*,
  447 F.3d 145 (2d Cir. 2006) . . . . . . . . . . . . . . . . 13

*United States v. Gayle*,
  No. 16 Cr. 361 (CS), Trial Tr. (S.D.N.Y. Sept. 14,
  2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Geibel*,
  369 F.3d 682 (2d Cir. 2004) . . . . . . . . . . . . . 43, 45

*United States v. Gordon*,
  291 F.3d 181 (2d Cir. 2002) . . . . . . . . . . . . . . . . 25

*United States v. Gupta*,
  747 F.3d 111 (2d Cir. 2014) . . . . . . . . . . . . . . . . 23

*United States v. Hajbeh*,
  565 F. Supp. 3d 773 (E.D. Va. 2021) . . . . . . . 33, 34

*United States v. Harvey*,
  746 F.3d 87 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 44

*United States v. Jass*,
  569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 24

*United States v. Jean-Claude*,
  No. 18 Cr. 601 (PGG), 2022 WL 2334509 (S.D.N.Y.
  June 27, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

*United States v. Marcus*,
  560 U.S. 258 (2010) . . . . . . . . . . . . . . . . . . . . 23, 25

vi

PAGE

*United States v. Marsh,*
    568 F. App'x 15 (2d Cir. 2014) . . . . . . . . . . . . . . . 36

*United States v. McDermott,*
    245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . 16

*United States v. Miller,*
    808 F.3d 607 (2d Cir. 2015) . . . . . . . . . . . . . . . . 43

*United States v. Morrison,*
    153 F.3d 34 (2d Cir. 1998) . . . . . . . . . . . . . . . 32, 33

*United States v. Mylett,*
    97 F.3d 663 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 18

*United States v. Naranjo,*
    14 F.3d 145 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 43

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . . 23

*United States v. Peguero,*
    34 F.4th 143 (2d Cir. 2022) . . . . . . . . . . . . . . . . 45

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . 11, 17

*United States v. Pluta,*
    176 F.3d 43 (2d Cir. 1999) . . . . . . . . . . . . . . 32, 33

*United States v. Raniere,*
    55 F.4th 354 (2d Cir. 2022) . . . . . . . . . .  11, 16, 17

*United States v. Ray,*
    No. 20 Cr. 110 (LJL), 2022 WL 817270 (S.D.N.Y.
    Mar. 16, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

vii

PAGE

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . 30, 35

*United States v. Riley*,
  638 F. App'x 56 (2d Cir. 2016) . . . . . . . . . . . . . . 45

*United States v. Rutigliano*,
  790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . . 11, 16

*United States v. Sabhnani*,
  599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 44

*United States v. Siddiqui*,
  699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . 23

*United States v. Svoboda*,
  347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . 44, 45, 46

*United States v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 32

*United States v. Villafuerte*,
  502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . 24, 27

*United States v. Williams*,
  998 F.3d 538 (2d Cir. 2021) . . . . . . . . . . . . . . . . 23

*Statutes, Rules & Other Authorities:*

15 U.S.C. § 78aa . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. § 3237(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . 8, 12, 16

viii

PAGE

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Evid. 103(a) . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . 34, 35, 37

Fed. R. Evid. 901 . . . . . . . . . . . . . . . . . . . . 30, 32, 33

Fed. R. Evid. 902 . . . . . . . . . . . . . . . . . . . . . . . . . 34

Petition for Writ of Certiorari, *Smith v. Arizona*,
    No. 22-899, 2023 WL 2571950 (U.S. filed Mar. 14,
    2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 23-7202(L), 23-7745(Con)

————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

STEPHEN BUYER, also known as Sealed Defendant 1,

*Defendant-Appellant.*

————————

## BRIEF FOR THE UNITED STATES OF AMERICA

————————

### Preliminary Statement

Stephen Buyer appeals from a judgment of conviction entered on September 19, 2023, and amended on November 7, 2023, in the United States District Court for the Southern District of New York, following a jury trial before the Honorable Richard M. Berman, United States District Judge.

Indictment 22 Cr. 397 (RMB) (the "Indictment") was filed on July 21, 2022, in four counts. Counts One and Three charged Buyer with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. Counts Two and Four

2

charged Buyer with securities fraud, in violation of 18 U.S.C. §§ 1348 and 2.

Trial commenced on February 23, 2023, and ended on March 10, 2023, when the jury convicted Buyer of all four counts in the Indictment.

On September 19, 2023, Judge Berman sentenced Buyer to 22 months' imprisonment, to be followed by three years' supervised release, and imposed a fine of $10,000, forfeiture of $354,027.72, and a $400 mandatory special assessment. On November 7, 2023, Judge Berman ordered Buyer to pay $765,912.61 in restitution.

Buyer is serving his sentence.

## Statement of Facts

### A. The Government's Case

The Government's proof at trial established that in 2018 and 2019, Buyer—a former government lawyer and member of Congress who was then working as a consultant—engaged in illegal insider trading in two publicly traded stocks. Buyer purchased shares of those stocks while in possession of material non-public information ("MNPI") about upcoming mergers and acquisitions between those companies and Buyer's consulting clients. In doing so, Buyer violated the trust and confidence of his clients and converted his clients' confidential information to his own benefit.

In March 2018, Buyer misappropriated MNPI from T-Mobile U.S. Inc. ("T-Mobile"), his consulting client, about its planned merger with Sprint Corp. ("Sprint").

3

He used that information to buy more than 110,000 shares of Sprint on March 29, April 3, and April 5, 2018, which he sold after the merger news became public, making a substantial profit. (PSR ¶¶ 17-25).[1] In 2019, Buyer misappropriated MNPI from Guidehouse, another of his consulting clients, about its planned acquisition of Navigant Consulting Inc. ("Navigant"). He used that information to buy more than 46,000 shares of Navigant on multiple dates between June 13 and August 1, 2019, which he sold at a substantial profit after news of the acquisition became public. (PSR ¶¶ 26-36). Buyer traded in his own accounts and the accounts of his family and friends—including one account in which he *only* traded Sprint and Guidehouse stock in 2018 and 2019 (A. 269)—illegally earning more than $340,000 in total. (PSR ¶¶ 21, 33).

The Government's evidence at trial included the testimony of 11 witnesses, including the individuals at T-Mobile and Guidehouse from whom the relevant

---

[1] "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with Buyer's sentencing; "Br." refers to Buyer's brief on appeal; "SPA" refers to the special appendix filed with Buyer's brief; "A." refers to the appendix filed with that brief; "GX" refers to a Government exhibit at trial not included in the appendix; "App. Dkt." refers to an entry on this Court's docket for this appeal; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, quotations omit internal quotation marks, citations, alterations, and footnotes.

4

MNPI had originated. The Government introduced Buyer's stock trading records, which reflected that Buyer's trades in Sprint and Navigant differed substantially from his other trades in stocks about which he did not have MNPI, both in the size of the trades and in their profitability. (A. 264-95). The Government also introduced communications and testimony reflecting the circumstances in which Buyer obtained the relevant MNPI shortly before trading. (A. 113, 153-202, 692-703, 715-24). The evidence also reflected that, when confronted about his trading by Guidehouse investigators, Buyer falsely denied that he had insider traded and then immediately sent an encrypted, auto-deleting message to his source at Guidehouse, stating that Buyer needed to see him and would "catch the next flight" to do so. (PSR ¶ 37).

### 1. Buyer's Insider Trading in Sprint

T-Mobile executive Anthony Russo shared MNPI with Buyer about the then-upcoming Sprint merger. (A. 153-202). As reflected in Russo's contemporaneous notes, Russo learned of the upcoming merger no later than March 27, 2018, and, as reflected in email communications, one of the first items on Russo's "to do list" was telling his "core group" of consultants about the merger. (A. 149, 715-25). Russo was clear that this core group included Buyer. (A. 149, 201-02). The next day, Russo and Buyer went on a three-day golf trip to Florida together, from March 28 to 30, 2018. (A. 153-58). In the middle of this golf trip, on March 29, 2018, Buyer purchased 42,675 shares of Sprint—a stock he had never purchased before—across multiple accounts for $206,578. (A. 271, 683, 689, 691). Although Russo

5

could not pinpoint with specificity when he had told Buyer about the merger plans, in an April 3, 2018 email, Russo told a colleague that Russo's core group was already aware of the merger. (A. 162). Russo explained that this meant that Buyer was aware of the merger by April 3, 2018, at the latest. (A. 162, 202). And on April 3 and April 5, 2018, Buyer purchased another 70,000 Sprint shares for an additional $361,509. (A. 267, 683, 685).

The proposed T-Mobile/Sprint merger was publicly announced on April 29, 2018. By early August, the price of Sprint stock increased substantially. (A. 270). Buyer sold his Sprint stock in early August 2018, approximately four months after purchasing it, for a profit of more than $126,000. (A. 271). Buyer's Sprint purchases were unusual as compared to his typical trading patterns, both in the size of the purchases and in their ultimate profitability. (A. 264-95).

## 2. Buyer's Insider Trading in Navigant

Guidehouse executive Alicia Harkness shared MNPI about Guidehouse's upcoming acquisition of Navigant with Guidehouse employee Christopher Stansbury, who then shared the MNPI with Buyer, who used it to trade. In early June 2019, Guidehouse was pursuing an acquisition of Navigant. (A. 206-07). Harkness was asked by Guidehouse's largest shareholder to answer questions regarding the potential acquisition. (A. 211-13). On June 12, 2019, to respond to the questions from the shareholder, Harkness spoke by phone with Stansbury, Guidehouse's sales director. (A. 213-14). After that call, Harkness sent Stansbury

6

an email referencing a "combination" with possible "synergies" in the revenue cycle management ("RCM") space. (*Id.*; *see* A. 545).

Approximately seventeen minutes after Stansbury received Harkness's June 12, 2019 email referencing a "combination" with possible "synergies," Stansbury called Buyer. (GX 605). That night, Stansbury and Buyer exchanged additional text messages and had another phone call. (GX 401, 605). After midnight that evening, Buyer accessed his brokerage account at Schwab and searched "NCI," the ticker for Navigant. (A. 549; GX 909). The next day, on June 13, 2019, Stansbury's cellphone contents were erased and restored to a backup, potentially deleting the recent data on the cellphone. (A. 310).

Beginning the following morning, and continuing for the next several weeks, Buyer purchased more than $1 million worth of shares in Navigant, a stock he had never purchased before. (A. 267-69). Text messages after June 12 made clear that Buyer knew of a potential acquisition. For example, on June 19, 2019, Buyer's business partner and longtime friend Michael Copher had dinner with Stansbury, Buyer's contact at Guidehouse, at which Stansbury asked whether Buyer had "figured it out yet." (A. 113). When Copher asked Stansbury what he was talking about, Stansbury responded that Buyer "thinks we are, we should, we're gonna, we need to buy somebody." (*Id.*). Thereafter, Copher sent a text message to Buyer asking, "Who do u think Guidehouse is trying to buy?" (GX 401, 401-A). Copher later had a follow-up conversation with Buyer

7

in which he told Buyer, "whatever you're thinking about doing, you probably shouldn't do it." (A. 115).

Electronic records confirmed that Stansbury knew the acquisition target before it became public knowledge. For example, on June 24, 2019, Stansbury accessed the Navigant website, (A. 653), and in July, before the merger announcement, Stansbury searched Navigant again and accessed articles about the company on his Google account. (A. 652).

Guidehouse's acquisition of Navigant was publicly announced on August 2, 2019, and the price of Navigant stock increased substantially. (A. 272). Buyer sold his Navigant stock later that day and in late September 2023, earning a profit of more than $227,000. (A. 272). Buyer's Navigant purchases were unusual as compared to his typical trading patterns, both in the size of the purchases and in their ultimate profitability. (A. 264-95).

At the request of the Financial Industry Regulatory Authority, Guidehouse later conducted an internal investigation into possible insider trading in connection with the Navigant acquisition. (A. 248). Guidehouse lawyers interviewed Buyer about his Navigant trades as part of that investigation. (A. 247-64). During the interview, Buyer lied to Guidehouse's counsel, telling them that he did not have any information about the upcoming acquisition of Navigant when he purchased his shares, and instead had purchased the shares based on analyst reports. (A. 253-55). Shortly thereafter, Buyer sent a message to Stansbury (the Guidehouse employee who had originally shared the MNPI with him) using an encrypted messaging

8

application. (A. 548). Buyer told Stansbury, in a message that was timed to automatically delete five minutes after being read, "I need to see you. Please . . . I will catch next flight." (*Id.*; *see* A. 312). Buyer then recounted to Stansbury the lies that Buyer had just told Guidehouse in his interview. (A. 548).

## B. The Defense Case and Verdict

In addition to vigorous cross-examination of the Government's witnesses, Buyer testified in his own defense. He claimed that his trades in both Sprint and Navigant were based solely on market research and publicly available information. (A. 484). Buyer also presented several summary charts regarding his stock trades through a defense summary witness, as well as eight character witnesses, none of whom had knowledge of the events underlying the charged conduct. (A. 365-402).

On March 10, 2023, after deliberating for less than four hours, the jury found Buyer guilty of all four counts. (A. 528).

## C. Buyer's Post-Trial Motions

At the conclusion of the Government's case and again before the case was submitted to the jury, Buyer moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (A. 60-67; *see* A. 363, 509). Among other things, Buyer argued that the evidence was insufficient to establish that he possessed any MNPI at the time of the relevant stock purchases, (A. 60-65), and that the Government had failed to

9

establish venue, (A. 65-67). The Government opposed the motion. (Dkt. 96).

By Decision and Order dated March 14, 2023, the District Court denied Buyer's motion. (SPA 1-7). Judge Berman considered and addressed each of Buyer's arguments and determined that the evidence was sufficient to sustain Buyer's convictions on all four counts and to establish that venue was proper in the Southern District of New York. (*Id.*).

### D. Buyer's Sentencing and Motions for Bail Pending Appeal

On September 19, 2023, Buyer appeared before Judge Berman for sentencing. The District Court concluded that the applicable United States Sentencing Guidelines range was 33 to 41 months' imprisonment, including an enhancement in offense level for obstruction of justice because Buyer had lied under oath during his trial testimony. (Dkt. 178 (Sent. Tr.) at 36-38). After hearing from the parties and from Buyer, the District Court sentenced Buyer to 22 months' imprisonment, to be followed by three years' supervised release, and imposed a fine of $10,000, forfeiture of $354,027.72, and a $400 mandatory special assessment. (*Id.* at 99-100). On November 7, 2023, after additional litigation, Judge Berman ordered Buyer to pay $765,912.61 in restitution. (SPA 17-24; Dkt. 207).

At sentencing, Buyer moved orally for bail pending appeal, and the District Court requested written submissions. Buyer asserted essentially the same arguments he now makes on appeal, among others. (Dkt. 171, 182). The Government opposed. (Dkt. 175). On

10

October 16, 2023, Judge Berman denied Buyer's motion for bail pending appeal, concluding that Buyer had not raised any substantial question as to whether the verdict might be vacated. (A. 70-81).

On October 24, 2023, Buyer renewed his request for bail pending appeal before this Court, (App. Dkt. 16, 23), which the Government again opposed, (App. Dkt. 17). On November 27, 2023, a panel of this Court heard argument on Buyer's motion for bail and denied the motion that same day. (App. Dkt. 25).

## ARGUMENT

### POINT I

### Sufficient Evidence Supported Buyer's Convictions

Buyer argues that the evidence was insufficient to establish that he possessed MNPI at the time of the charged purchases of both Sprint and Navigant stock. (Br. 59-74). Because there was ample evidence that Buyer purchased both stocks immediately after receiving MNPI, his convictions on all counts should be affirmed.

### A.  Applicable Law

Although this Court will "review sufficiency of evidence challenges *de novo* . . . defendants face a heavy burden, as the standard of review is exceedingly deferential" to the jury's verdict. *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a

11

reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (emphasis in original). A court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is non-existent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020). The Court "must analyze the pieces of evidence in conjunction, not in isolation," *Persico*, 645 F.3d at 104, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023). The Court must also "credit every inference that the jury might have drawn in favor of the government, because the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022). Because the jury is entitled to choose which inferences to draw, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

"These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105. "A jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015).

12

## B.  Discussion

As he did before the jury, Buyer argues that there was insufficient evidence that he possessed any MNPI when he made his stock purchases, focusing principally on the fact that the individuals who the Government alleged transmitted the MNPI to him—Russo and Stansbury—either did not remember exact timing or did not testify. (Br. 59-74). As Judge Berman correctly concluded in denying Buyer's Rule 29 motion, the argument is without merit. Ample evidence supported the jury's conclusion that Buyer committed insider trading in both Sprint and Navigant stock, including the timing of the trades immediately after private conversations with persons who possessed MNPI; the surrounding electronic communications; the unusual quantities and profitability of the trades compared to Buyer's other trading activity; subsequent communications; and Buyer's reaction when questioned about that trading activity. Buyer's complaint that the evidence is all circumstantial, rather than direct, bears no relevance to the sufficiency question.

First, the evidence at trial was more than sufficient for the jury to rationally conclude that, during their March 28 to 30, 2018 golf trip, Russo told Buyer about T-Mobile's upcoming merger with Sprint. Russo testified that he learned of the merger before the golf trip (A. 149, 715-25); that one of the items on his "to do" list at the time was telling his core group of consultants about the merger (*Id.*); that Buyer was in this core group (A. 149, 201-02); and that Russo and Buyer then went on the golf trip together. As Judge Berman observed in denying Buyer's Rule 29 motion, trading

13

data established that Buyer's first purchase of Sprint shares occurred "on March 29, 20018, *i.e.*, literally in between golf games which included [Buyer and Russo]." (SPA 5; *see* A. 267). Indeed, Buyer had never purchased Sprint shares before, yet purchased more than 110,000 shares of the stock between March 29 and April 5, 2018. (A. 267). Russo's testimony was further corroborated by his April 3, 2018 email to a colleague that his core group was aware of the merger by that date. (A. 162). Moreover, Buyer purchased his Sprint shares across multiple accounts, including at least one account that *only* traded in Sprint and Navigant stock. (A. 269). Finally, the jury was entitled to rely on the additional body of evidence reflecting that he committed similar insider trading in Navigant stock when evaluating the likelihood that the overwhelming circumstantial evidence about the Sprint trades was simply a highly improbable coincidence, as Buyer implicitly asserts.

In any event, Russo testified that by at least April 3, Buyer knew of the impending merger and, therefore, possessed MNPI. (A. 162). Even if the above-described evidence was insufficient to establish that Buyer knew of the merger for his March 29 purchases, Russo's testimony is direct evidence that Buyer possessed MNPI by April 3 and 5, when he made additional purchases of Sprint stock. That testimony, standing alone, is sufficient to sustain the jury's verdict as to Counts One and Two, which related to the Sprint trading. *See, e.g.*, *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (stating "well established" rule that federal conviction can be based on testimony of single witness, and lack of corroboration "raises a question as to the

14

weight a jury might choose to give that testimony, not
its legal sufficiency to support a conviction").

Second, Buyer's argument that he did not possess
MNPI regarding Guidehouse's contemplated acquisi-
tion of Navigant when he purchased Navigant stock is
similarly incorrectly dismissive of the trial evidence.
The evidence was more than sufficient for a jury to con-
clude that the defendant received MNPI from Stans-
bury on June 12, 2019, and began purchasing Navi-
gant stock the next day. That evidence included Hark-
ness's testimony about her call with Stansbury on
June 12, 2019 for help responding to questions about
the merger (A. 211-14); the email Harkness sent to
Stansbury that day, which referenced a "combination"
with "synergies"—words plainly indicative of a corpo-
rate merger or acquisition (A. 545); phone records re-
flecting that Stansbury immediately called Buyer after
receiving that email and communicated several times
with him that evening (GX 401, 605); electronic rec-
ords reflecting that Buyer searched his brokerage web-
site for the Navigant stock symbol that same night
(A. 549; GX 909); and trading records reflecting that
Buyer bought more than $600,000 worth of Navigant
stock—which he had never purchased before—the
next morning (A. 272), and more than $1 million worth
of Navigant stock over the next few weeks (A. 274),
which was abnormal when compared to Buyer's trad-
ing patterns (A. 273-74). And evidence post-dating
June 12, 2019 corroborated that Buyer had learned of
the confidential acquisition plans before he began pur-
chasing Navigant stock, including the communications
between Copher and Stansbury about how Buyer
knew what was happening and Copher's subsequent

15

communications with Buyer about that matter. (A. 113, 115; GX 401, 401-A).

Buyer's reaction upon being questioned by Guidehouse counsel about possible insider trading was substantially indicative of consciousness of guilt, and the jury was reasonably entitled to so conclude. After being interviewed, Buyer used an encrypted messaging application set to automatically delete after five minutes to message Stansbury, "I need to see you. Please . . . I will catch the next flight." (A. 312, 548). The jury could reasonably have concluded that the reason Buyer used encrypted messaging and preferred to communicate in person, even though it required him to take a flight, was because he did not want to leave a record of the substance of the conversation that law enforcement could later discover.

Buyer's principal argument, though it appears in multiple forms, is that each of the above-described pieces of evidence is circumstantial and, standing alone, does not necessarily *command* the inference of guilt that the jury drew from the totality of the evidence. (*See, e.g.*, Br. 62 (challenging inference from "core group" testimony and emails); Br. 64 (challenging inference from timing of Sprint trades during golf trip); Br. 67-68 (challenging inference from Harkness-Stansbury communications, calling phrases "revenue synergy" and "combination" "cryptic, unexplained language"; Br. 72, 74 (challenging inference from timing of Navigant trades same evening as Stansbury spoke to Buyer); Br. 73 (challenging inference from use of encrypted messaging); Br. 74 n.11 (challenging relevance of Stansbury erasing his cellphone morning after

16

communicating with Buyer on day Buyer purchased stock because "people restore their phones from back-ups for many reasons.")).

The argument is flawed for two reasons. First, this Court has repeatedly and emphatically held that "[c]ir-cumstantial evidence is a legitimate form of evidence in this Circuit, and in fact-intensive cases such as this, requiring careful examination of trading records and a myriad of public information, the jury is the appropri-ate body to determine a defendant's guilt or inno-cence." *United States v. McDermott*, 245 F.3d 133, 138-39 (2d Cir. 2001) (concluding that evidence of phone calls temporally connected to trading conduct was suf-ficient to permit jury conclusion of insider trading); *see Rutilgiano*, 790 F.3d at 402 ("A jury's verdict may be based entirely on circumstantial evidence.").[2] Indeed, "the task of choosing among competing, permissible in-ferences is for the jury, not for the reviewing court." *Raniere*, 55 F.4th at 364. Buyer's arguments are all ap-propriate ones for him to have made to the jury, but they do not move the needle on Rule 29 sufficiency. Second, a reviewing court's task is not to evaluate each piece of evidence in isolation, but rather to apply the

---

[2]    Buyer's argument that the Government's proof was somehow fatally flawed because Russo could not recall exactly when he shared MNPI with Buyer, and Stansbury did not testify, (Br. 59-61, 67-68), is merit-less for the same reason. There is no requirement that the Government call any particular witness or prove a defendant's guilt through any particular direct testi-monial evidence.

17

sufficiency standards "to the totality of the government's case . . . as each fact may gain color from others." *Avenatti*, 81 F.4th at 184; *see Persico*, 645 F.3d at 104. When properly assessed—drawing "every inference that the jury might have drawn in favor of the government," *Raniere*, 55 F.4th at 364, and considering the evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104—the collective body of evidence introduced at trial amply supported the jury's determination of guilt, as Judge Berman correctly concluded.

Buyer's remaining arguments as to his Sprint trading are similarly unpersuasive. First, Buyer's recounting of when he was *officially* notified of the upcoming T-Mobile/Sprint merger and what the *proper* channels would have been for him to be so notified (Br. 61, 63) bears no relevance to whether the jury could have permissibly concluded that he *improperly* received MNPI about the merger from Russo prior to being formally informed of it. Nor is there any force to the argument that, if Russo had shared MNPI with Buyer on the golf trip, the other two players in the golf foursome would have also known the MNPI, but they allegedly did not. (Br. 65-66). Plainly, there could be myriad opportunities for two golf players to have a private conversation during the course of the day outside of earshot of other players, but in any event the argument is for the jury, not a reviewing court.

The sufficiency analysis as to the Navigant trades is unaffected by Buyer's argument that the evidence did not rule out that either Stansbury or Buyer merely "deduced" the upcoming acquisition without being

18

specifically told that it would definitely happen. (Br. 72-73).[3] This Court has held that "piec[ing] together" information acquired through breach of a relationship of trust and confidence can amount to misappropriation of MNPI. *United States v. Mylett*, 97 F.3d 663, 667-68 (2d Cir. 1996). There, an employee of AT&T had inferred that AT&T was going to acquire NCR Corporation because he had conducted a feasibility study relating to the merger of AT&T with an unnamed company that had the same vital statistics as NCR. *Id.* at 666. This Court rejected his argument that there was no misappropriation because he had "concluded through his own ingenuity that AT&T would acquire NCR," emphasizing that he had come to that conclusion based on "information that he pieced together through the course of his employment." *Id.* at 667-68. Here, too, the Government was not required to prove that Buyer was told definitively that Navigant was the target of Guidehouse's planned acquisition, but merely that he was told sufficient non-public information to be able to reach a more informed conclusion than the public at large. *See id.* at 666-67 ("At the very least, these non-public facts would make a reasonable investor less likely to believe that 'nothing' would

_____

   [3]  Buyer's argument that he "deduced" that Guidehouse was considering acquiring some other company, not Navigant, (Br. 73), makes little sense given that Buyer purchased Navigant stock after the so-called deduction.

19

happen. That by itself would be information with significant market value.").

Ultimately, Buyer's arguments regarding the reasonable inferences about his possession of MNPI were raised at trial, including through his own testimony, but were rejected by the jury. While the jury perhaps could have accepted Buyer's highly unlucky and coincidental version of events, there was more than sufficient evidence for the jury to conclude that the facts were exactly as they appeared. *See Facen*, 812 F.3d at 286 ([T]he government's case need not exclude every possible hypothesis of innocence."); *Capers*, 20 F.4th at 113 (reversal for insufficiency appropriate only where evidence of guilt "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt").

## POINT II

### The District Court Correctly Admitted Limited Portions of Stansbury's Cellphone Contents and Volchko's Testimony About Them

Buyer challenges the District Court's decision to admit limited excerpts of an extraction from Stansbury's cellphone (GX 655, the "Stansbury Phone Contents") along with equally limited explanatory testimony from digital forensic examiner Jessica Volchko of the Federal Bureau of Investigation ("FBI"). The challenge is meritless, unpreserved in part, and harmless in any event. Judge Berman did not abuse his discretion in concluding that the evidence in question was sufficiently authenticated and did not constitute expert testimony, nor did its admission violate the

20

Confrontation Clause—the latter of which was not sufficiently argued below to have preserved the issue.

## A. Relevant Facts

Volchko testified on March 6, 2024. As she was called to the stand, Buyer objected to her testimony on two grounds: (1) that she would be offering expert opinion testimony that had not been noticed as such before trial, and (2) that the Stansbury Phone Contents that the Government intended to admit during her testimony had not been sufficiently authenticated by a chain of custody. (A. 305-06). There was no mention of the Confrontation Clause. After hearing argument at sidebar, Judge Berman admitted the testimony. (A. 306).

Volchko testified briefly about her work as a digital forensic examiner for the FBI, including her work reviewing printouts reflecting the electronic contents of cellphones where the original extraction of the data from the cellphone had been performed by another examiner. (A. 306-07). Volchko was then shown the Stansbury Phone Contents, which was a Cellebrite extraction.[4] Volchko testified that she recognized the Stansbury Phone Contents as a Cellebrite printout that contained the contents of a cellphone extraction. (A. 307).

---

[4] Cellebrite is a software program that extracts the digital contents of electronic devices and formats the data into a single large PDF document for easier human review.

21

Volchko then compared the Stansbury Phone Contents printout to a business record that had been created by Guidehouse personnel in 2019 when they had created their own forensic extraction of Stansbury's cellphone (A. 657-58, the "Stansbury Phone Form"). The Stansbury Phone Form had been previously admitted into evidence through the testimony of Guidehouse lawyer Kelly Koscuiszka, who testified that in 2019 Guidehouse had created a digital copy of the contents of Stansbury's cellphone as part of its internal investigation. (A. 251-52). This process was documented on the Stansbury Phone Form, which recorded the date that the copy of the cellphone had been made, the phone number assigned to the cellphone that had been copied, the cellphone's IMEI (a unique 15-digit serial number for identifying a mobile electronic device), and the phone's owner Christopher Stansbury, among other things. (A. 657-58).

Volchko testified that the Stansbury Phone Contents and the Stansbury Phone Form both appeared to relate to a cellphone with the same unique identifiers, including the same unique IMEI, the same date of extraction, the same assigned phone number, and the same device ID ("Chris's iPhone"). (A. 307-09; *see also* A. 654-55, 657-58). A stipulation between the parties confirmed that the phone number reflected on both documents was the cellphone number used by Stansbury. (A. 726-30). After a brief voir dire of Volchko on chain of custody and authentication issues, Buyer renewed his objection to the testimony and exhibits, which Judge Berman overruled. (A. 307-08). Volchko then read the jury certain communications and documents from the Stansbury Phone Contents. (A. 309-

22

13). Buyer twice more renewed his objection on grounds of "No foundation," which Judge Berman overruled each time. (A. 309-10).

Before the cross-examination of Volchko, the District Court asked the parties for overnight, simultaneous briefing on the "argument that was presented orally," *i.e.*, the authentication and expert testimony issues. (A. 314). Once Volchko's testimony concluded, the District Court repeated its request for overnight briefing. (A. 340). When the Government asked for clarity about which portion of the testimony Buyer was contesting, Buyer clarified that he was objecting to "all of [Volchko's] testimony," based on "the lack of notice of expert notice." (*Id.*).

That evening at 8:00 p.m., the parties filed simultaneous letters regarding Volchko's testimony. (Dkt. 91 (Government letter); A. 58-59 (defense letter)). Buyer reiterated his arguments about authentication and expert testimony. (A. 58-59). In the introduction and in a single sentence at the end of his letter, Buyer asserted in conclusory fashion, and for the first time, that admission of the Stansbury Phone Contents violated the Confrontation Clause. (*Id.*). The District Court ruled the next morning that Volchko's testimony would not be stricken. (A. 359). The Government then asked its last witness a handful more questions and rested. (A. 363).

## B.  Applicable Law

A district court's evidentiary rulings, such as those regarding expert witnesses and authentication, are reviewed for abuse of discretion and will be reversed

23

"only when the court acted arbitrarily or irrationally." *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006); *United States v. Gupta*, 747 F.3d 111, 131-32 (2d Cir. 2014). Under that "deferential" standard, an evidentiary ruling may be disturbed "only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Delva*, 858 F.3d 135, 156 (2d Cir. 2017). Even a "manifestly erroneous" evidentiary ruling does not warrant a new trial if the error was harmless, *i.e.*, if the Court determines with "fair assurance that the evidence did not substantially influence the jury." *United States v. Cummings*, 858 F.3d 763, 771 (2d Cir. 2017); *see United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); Fed. R. Crim. P. 52(a).

Where a defendant did not raise during trial a claim of error he later makes on appeal, this Court will review that claim for plain error only. *See, e.g.*, *United States v. Williams*, 998 F.3d 538, 540 (2d Cir. 2021); *United States v. Dove*, 884 F.3d 138, 151 (2d Cir. 2018). To establish eligibility for plain-error relief, a defendant must satisfy four requirements. "First, there must be an error. Second, the error must be plain. Third, the error must affect substantial rights, which generally means that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). An error is "plain" where it is "clear or obvious, rather than subject to reasonable dispute." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Fourth, an appellate court has discretion to "grant relief if it concludes that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Greer*, 141 S. Ct. at 2096-97.

24

"[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villa-fuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "[T]he defend-ant has the burden of establishing each of the four re-quirements for plain-error relief." *Greer*, 141 S. Ct. at 2097. "Meeting all four prongs [of the plain error standard] is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).[5]

## C. Discussion

### 1. The Admission of Volchko's Testimony and Accompanying Exhibits Did Not Violate the Confrontation Clause

Nothing about Volchko's testimony or admission of the Stansbury Phone Contents violated the Confronta-tion Clause. There was no error, plain or otherwise, in the admission of that evidence.

---

[5] Should this Court determine that Buyer did suf-ficiently preserve his Confrontation Clause argument, it would then review the issue *de novo*, subject to harmlessness analysis pursuant to which the error can be disregarded if it is harmless beyond a reasonable doubt. *United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009).

25

### a.    Plain-Error Review Applies, and Buyer Has Failed to Satisfy Its Requirements

As an initial matter, because Buyer did not contemporaneously or sufficiently raise this argument during trial, the issue is reviewed only for plain error. *Marcus*, 560 U.S. at 262. As described above, before, during, and after Volchko's testimony during the trial day, Buyer objected only on authenticity and expert-related grounds. (A. 305-06, 307-10, 340). Judge Berman then ordered briefing on those particular arguments. The Confrontation Clause was not mentioned until *after* the jury had already heard the testimony, seen the relevant exhibits, and even heard testimony from subsequent witnesses—and it was raised in a single sentence in Buyer's letter brief that was otherwise entirely about authenticity and expert-witness issues. (A. 59). That letter brief stated only that "[t]he admission of the analyst's report also violates the Confrontation Clause of the Sixth Amendment," without any further development and citing only one case. (A. 58-59).

This single passing reference in an overnight brief, after the witness had finished her testimony, is insufficient to tee the issue up for Judge Berman to meaningfully evaluate and, therefore, the issue is now subject only to plain-error review. *See* Fed. R. Evid. 103(a) (requiring timely objection along with statement of specific ground); *United States v. Check*, 582 F.2d 668, 676 (2d Cir. 1978) (objection must be "made as soon as the ground of it is known, or reasonably should have been known to the objector"); *United States v. Gordon*,

26

291 F.3d 181, 190 (2d Cir. 2002) (objections on one ground do not preserve for appellate review other related arguments); *United States v. Crowley*, 236 F.3d 104, 108 (2d Cir. 2000) (generalized objection to indictment as vague without more was insufficient to preserve issue where it did not specify which part of indictment was vague or what facts were missing); *cf. United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) (noting, in context of arguments raised on appeal, "settled appellate rule that issues adverted to [in appellate briefs] in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Buyer cannot satisfy any of the elements of plainerror review: setting aside whether there was error, any such error was not "plain or obvious" in light of the ever-evolving case law in the Confrontation Clause context, that there is no on-point case from this Court precluding the admission of cellphone extractions in this context, and that district courts in this Circuit routinely admit cellphone extraction evidence without the testimony of the person who originally operated the extraction software. *See, e.g.*, *United States v. Jean-Claude*, No. 18 Cr. 601 (PGG), 2022 WL 2334509, at *21-24 (S.D.N.Y. June 27, 2022) (admitting cellphone contents even though witness who had performed the extractions did not testify); *United States v. Gayle*, No. 16 Cr. 361 (CS), Trial Tr. 1084-85 (S.D.N.Y. Sept. 14, 2017) (same, concluding that issue goes to weight, not admissibility, of cellphone extraction).

27

Nor has Buyer carried his burden of establishing that any error affected his substantial rights, for the reasons described below. Finally, Buyer has not even attempted to satisfy the final plain-error requirement, nor could he; there is no basis to conclude that the erroneous admission of this inconsequential evidence "had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Greer*, 141 S. Ct. at 2096-97; (*see* Br. 38 (cursorily addressing only first, second, and third plain-error requirements)). Buyer has failed to satisfy his "difficult" burden, *Puckett*, 556 U.S. at 135, of demonstrating that a "miscarriage of justice" would result from failing to order a new trial on this basis, *Villafuerte*, 502 F.3d at 209.

> **b.    There Was No Error, Plain or Otherwise, in Judge Berman's Decision Not to Strike Volchko's Testimony and Accompanying Exhibits**

Regardless of the standard of review, the District Court committed no error, plain or otherwise, in admitting Volchko's testimony and the Stansbury Phone Contents. There were no testimonial out-of-court statements admitted at trial as prohibited by the Confrontation Clause and *Bullcoming v. New Mexico*, 564 U.S. 647, 658 (2011). (Br. 31-38).

As Judge Berman correctly concluded when he was first properly briefed on the question in connection with Buyer's request for bail pending appeal, (*see* A. 70-75), the Stansbury Phone Contents are nothing like the written expert opinion at issue in *Bullcoming*.

28

There, the Supreme Court concluded that a report containing an absent expert witness's specialized opinion (in that case, a chemist's conclusion regarding the results of intoxication testing) is "testimonial" and cannot be introduced in the absence of cross-examination of the expert who reached the conclusions and rendered the opinions at issue. *Bullcoming*, 564 U.S. at 658. The report admitted in *Bullcoming* resembled the sworn out-of-court affidavits rejected in the Supreme Court's prior decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), because they included certifications by the absent expert witness that the expert had received the relevant blood sample intact, had checked that the sample corresponded to the correct report number, and had performed a particular test following a specified protocol. *Bullcoming*, 564 U.S. at 660. The report at issue also included a portion where the analyst who conducted the testing could identify any "circumstance or condition" that "affected the integrity of the sample or the validity of the analysis." *Id.* The Supreme Court concluded that those representations as to the presence or absence of such circumstances conveyed "past events and human actions not revealed in raw, machine-produced data" and are therefore core testimonial statements of the absent expert witness that should be subject to cross-examination. *Id.*

Similarly, *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021), on which Buyer relies, involved equally clear out-of-court statements of an absent witness. There, this Court concluded that a detailed autopsy report prepared by a medical examiner in aid of an ongoing police investigation was a testimonial document that

29

could not be admitted absent cross-examination of the medical examiner who conducted the autopsy. *Id.* at 133-35. This Court reasoned that, under the Supreme Court's Confrontation Clause cases, an autopsy report is plainly a document resembling an affidavit in which an out-of-court witness makes testimonial statements. The autopsy report consisted almost *entirely* of express statements of the medical examiner, who had conducted a variety of tests and autopsy procedures on the deceased and then documented those steps and her observations, findings, opinions, and conclusions. *See id.* at 126.[6]

In stark contrast to the *Bullcoming* blood alcohol content expert report and the *Garlick* autopsy report, the Stansbury Phone Contents were not a written expert opinion at all and contained no express certifications or representations by an absent witness; the exhibit was merely the contents of Stansbury's

---

[6] Buyer's argument that *Bullcoming* and *Garlick* stand for the proposition that any document capturing machine-generated results is testimonial, (Br. 32), substantially over-reads these cases. In *Bullcoming*, the Supreme Court simply rejected the lower court's rationale in admitting the blood alcohol report, which was that the report reflected a human analyst acting as a "mere scrivener" of automatically generated results, because the premise of that reasoning was incorrect given the representations of the analyst that were contained in the report. *Bullcoming*, 564 U.S. at 659-60.

30

cellphone. It contained no written results of an absent witness's expert evaluation or opinion of other evidence or a certification of testing that the absent witness had conducted. It is of no moment that the person who transferred the data from the cellphone itself into the Cellebrite computer program to save it in readable document format did not testify; unlike in *Bullcoming*, no testimonial statements of that person were offered at trial. The Stansbury Phone Contents were not "statements" of that person at all; they were merely a printout of electronic data. *See, e.g.*, *Jean-Claude*, 2022 WL 2334509, at \*21-24; *United States v. Gayle*, Trial Tr. 1084-85. Absent admission of a testimonial document authored by a witness who did not testify at trial, there was no Confrontation Clause violation in admission of the Stansbury Phone Contents.

Nor was Volchko's testimony itself a violation of the Confrontation Clause. Volchko's testimony was based on her own experience, *see United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007), and served only to explain why it was reasonable for the jury to conclude that the Stansbury Phone Contents exhibit was, as it appeared to be, the contents of Stansbury's cellphone for authentication purposes under Rule 901. Because Volchko's testimony did not relay testimonial statements of an absent witness, Confrontation Clause jurisprudence was not applicable, and Judge Berman correctly concluded that the Clause required only that Volchko herself be subject to cross-examination, which she was. (A. 74-75).

Buyer's argument that use of a surrogate witness cannot cure a Confrontation Clause violation, (Br. 33-

36), and that the Government may not "circumvent the Confrontation Clause by introducing the same substantive testimony in a different form," (Br. 36 (quoting *Ryan v. Miller*, 303 F.3d 231, 248-49 (2d Cir. 2002))), are straw man responses to arguments the Government does not make and Judge Berman did not adopt when denying Buyer's motion for bail pending appeal, (A. 74), which as described above was the first time Judge Berman was actually presented with argument on the matter. Contrary to Buyer's contention, the District Court did not conclude that Volchko was a substitute witness whose presence for cross-examination cured what would otherwise be a Confrontation Clause violation in admission of the Stansbury Phone Contents. Rather, Judge Berman's conclusion that the Confrontation Clause was satisfied by Volchko's presence for cross-examination flowed directly from his rejection of Buyer's premise that the Stansbury Phone Contents contained testimonial statements at all.[7]

_____

[7]    For the same reason, the Supreme Court's pending decision in *Smith v. Arizona*, No. 22-899 (argued Jan. 10, 2024), has no relevance. *Smith* presents the question of whether the Confrontation Clause permits the prosecution to "present testimony by a substitute expert conveying the testimonial statements of a non-testifying forensic analyst, on the grounds that (a) the testifying expert offers some independent opinion and the analyst's statements are offered not for their truth but to explain the expert's opinion, and (b) the defendant did not independently seek to subpoena the analyst." Petition for Writ of Certiorari, *Smith v. Arizona*,

32

### 2. There Was No Abuse of Discretion in the District Court's Conclusion that the Stansbury Phone Contents Were Sufficiently Authenticated

Judge Berman did not abuse his discretion in concluding that the Stansbury Phone Contents were sufficiently authenticated to admit at trial. (*See* Br. 38-41).

"The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). A document is properly authenticated if a reasonable juror could find in favor of authenticity. *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004). The proponent need not "rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999). "A break of the chain of custody, even if it did occur, 'do[es] not bear upon the admissibility of evidence, only the weight of the evidence.'" *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998).

Judge Berman did not act arbitrarily or irrationally in concluding that the evidence provided a more-than-sufficient basis for the jury to conclude that the Stansbury Phone Contents were, in fact, a printout of the digital contents of Stansbury's cellphone, as reflected in the 2019 image of that cellphone extracted by

--------

No. 22-899, 2023 WL 2571950 (U.S. filed Mar. 14, 2023). The Government did no such thing here.

33

Guidehouse personnel during its internal investigation. (A. 149). Guidehouse lawyer Kelly Koscuiszka testified that, during the course of Guidehouse's internal investigation, a forensic image of the contents of Stansbury's cellphone was created, and a business record—the Stansbury Phone Form—was created that recorded (1) the date of the extraction of Stansbury's phone, (2) the unique IMEI number for Stansbury's phone, and (3) the name of the user of the phone, "Chris Stansbury." (Tr. 669-71; *see* A. 657-58). And the identifying data on the front page of the Stansbury Phone Contents matched the identifying data from the Stansbury Phone Form; both reflected a cellphone with the same assigned phone number, that was extracted on the same day, and that had the same unique IMEI identifier. (A. 307). Judge Berman did not abuse his discretion in concluding that, given the low bar established by Rule 901, nothing more was required to permit the jury to conclude that the Stansbury Phone Contents were what they "purport[ed] to be." *Pluta*, 176 F.3d at 49. Buyer's arguments about the possibility that the Stansbury Phone Contents were not reliable go to the weight of that evidence, not its admissibility. *Morrison*, 153 F.3d at 57—an argument he made to the jury.

Buyer's arguments to the contrary are unpersuasive. Buyer relies on *Bullcoming*, 564 U.S. 647, and *United States v. Hajbeh*, 565 F. Supp. 3d 773 (E.D. Va. 2021), for the proposition that authenticating a forensic report requires testimony from the testing analyst, calling such a conclusion "routine." (Br. 39). Insofar as Buyer relies on *Bullcoming*, which is not an authenticity case under Rule 901 at all, the argument assumes

34

that the Stansbury Phone Contents were a "forensic
report" by an absent expert witness and collapses into
the Confrontation Clause argument discussed above.
And *Hajbeh* addressed whether affidavits from law en-
forcement officers who performed certain cellphone ex-
tractions using Cellebrite could be used under Federal
Rule of Evidence 902(13), which permits out-of-court
certifications to render evidence self-authenticating in
certain circumstances. Relying on Confrontation
Clause cases that address when testimonial state-
ments can be presented to the jury, the district court
concluded that even the non-jury use of certifying evi-
dence under Rule 902(13) violated the Confrontation
Clause but cited no law for that proposition. *Id.* at 776-
77. In any event, the Government here did not rely on
sworn affidavits to trigger the self-authentication
rules under the Federal Rules of Evidence, which
would have entirely deprived the jury of the ability to
test the authenticity of the cellphone extractions. Ra-
ther, in this case the Government presented to the jury
the evidence from which it was urging a conclusion of
authenticity, and Buyer was free to (and did) challenge
that authentication evidence before the jury. Nothing
more is required.

### 3. There Was No Abuse of Discretion in the District Court's Conclusion that Volchko's Testimony Was Not Expert Opinion

Judge Berman also did not abuse his discretion in
concluding that Volchko's limited testimony did not
encompass the sort of expert opinions that are gov-
erned by Federal Rule of Evidence 702. Nor did she ed-
ucate the jury about an area that fell within

specialized knowledge that otherwise could not be understood by the average layperson. (*See* Br. 41-44). Instead, as Judge Berman correctly concluded, her testimony was simply based on her first-hand knowledge and observations from reviewing the Stansbury Phone Contents and having reviewed similar phone extractions in the course of her work as an FBI employee.

Volchko testified that she was familiar with Cellebrite, that she regularly reviewed extractions that were generated using the Cellebrite software, that the Stansbury Phone Contents appeared to be a Cellebrite phone extraction, and that certain other exhibits were excerpts of the Stansbury Phone Contents. (A. 307-18). She also testified about her general familiarity with the Signal encrypted messaging application, (A. 311-12), and what electronic cookies and "p-list" files are, (A. 309-10).

Nothing about that testimony constitutes Rule 702 expert testimony. That Rule permits someone with "scientific, technical, or other specialized knowledge" to testify "in the form of an opinion" if that opinion is based on sufficient facts or data and is based on application of reliable principles and methods to the facts of the fact. Fed. R. Evid. 702. By contrast, "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony expert as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." *Rigas*, 490 F.3d at 224.

36

Volchko's testimony here was based entirely on her own personal observations and knowledge gained in the course of her work for the FBI. She did not render any opinions at all, nor did she conduct any testing or apply principles and methods to the facts of this case to reach an independent conclusion about a material fact. She merely explained what she had come to learn about what Cellebrite is and what resulting extractions from that software look like. The fact that she has received training on these topics does not, standing alone, turn her testimony into expert opinion.

Thus, law enforcement personnel routinely testify regarding extractions of cellphone and computer contents and other electronic searches without need for qualification as experts, and this Court has affirmed such testimony. *See, e.g.*, *United States v. Marsh*, 568 F. App'x 15, 17 (2d Cir. 2014) (finding no error in allowing non-expert testimony relating to search of electronic device where witness "explained his training," "described" his search, and "testified to the contents of the messages retrieved from the phone"); *accord, e.g.*, *United States v. Berry*, 318 F. App'x 569, 569 (9th Cir. 2009) (expert testimony not necessary where witness "simply testified to what he found on the hard drive of [defendant's] computer, without expressing an opinion that required specialized knowledge or offering insight beyond common understanding"); *United States v. Avenatti*, No. 19 Cr. 374 (JMF), Dkt. 381, at 624-31 (S.D.N.Y. Jan. 26, 2022) (trial transcript of Volchko testimony regarding forensic searches without qualification as expert); *see also United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 817270, at *1 (S.D.N.Y. Mar. 16, 2022) (rejecting defense motion to preclude witness

37

on grounds that government failed to notice testimony regarding searches conducted on website data as expert testimony).

Nor were the portions of Volchko's testimony about the Signal encrypted messaging application and cookies and "p-list" files the result of Rule 702 expertise. Rather, Volchko merely explained certain facts that are commonly known among individuals who have downloaded the Signal application to their cellphones or who have some familiarity with the internet and the mechanics of web browsing and cellphone settings.[8]

Buyer's attempt to distinguish this Court's decision in *Marsh* as involving a circumstance where a law

---

[8] The extent of Volchko's explanation of cookies is as follows: "Cookies are basically small text files. So when you're browsing the internet, your device is interacting with that website, and sometimes it can indicate websites that were visited or advertisements that were on the page. . . . So when you're visiting certain websites, your device is interacting with that website. So it saves essentially small text files on your device; so the next time you visit it, things load a little bit quicker. And it could indicate websites that were visited or, like I said, advertisements that were on the page." (A. 309). The extent of her explanation of "p-list" files was: "A P-list stands for property list. And it's files that Apple devices use to store configurations, settings, and the user's interaction with the device." (A. 310).

38

enforcement officer testified about a Cellebrite extraction he personally conducted, (Br. 44 n.7), is a distinction without a difference. That witness's testimony necessarily involved the same degree of explanation of the Cellebrite software and what the resulting extraction document looks like as did Volchko's testimony. Whether Volchko's testimony constituted an expert opinion based on the application of specialized knowledge to the facts of this case does not depend on who mechanically operated the computer program that extracted the Stansbury Phone Contents from Stansbury's cellphone. As this Court concluded in *Marsh*, there was no abuse of discretion in Judge Berman's admission of Volchko's testimony as personal knowledge-based fact testimony.

### 4. Any Error Was Harmless

In any event, even if the Stansbury Phone Contents or Volchko's testimony were admitted in error (which they were not), any error was harmless because the contents of Stansbury's cellphone constituted only a very small piece of the Government's evidence of Buyer's insider trading.

From the Stansbury Phone Contents, only a handful of excerpts were introduced as evidence: a single cookie showing that Stansbury had visited Navigant's website on June 20, 2019 (A. 653); text messages between Stansbury and Copher arranging to meet for dinner on June 19, 2019 (GX 655-A); and evidence that Stansbury had restored his cellphone from an iCloud back-up on June 13, 2019 (A. 656).

39

None of this evidence related to Buyer's insider trading in Sprint at all, and none of it was central or critical to the Government's case as to Buyer's insider trading in Navigant. First, the text messages about the June 19, 2019 dinner could not have substantially swayed the jury: Copher testified at trial about the dinner, and its occurrence was not contested. The cookie showing that Stansbury had visited Navigant's website was similar to uncontested evidence obtained from Stansbury's Google account, which showed that he had searched for "Navigant consulting" and visited Navigant's website in July 2019, before the public announcement. (A. 652, 731-32). Further, the Government introduced evidence that Buyer himself searched for information about Navigant online just hours after speaking with Stansbury on June 12, 2019. (A. 692-704). Last, the evidence that Stansbury had restored his cellphone from an iCloud backup could not have substantially swayed the jury, as defense counsel elicited from Volchko during cross examination that people restore their phones from back-ups for many reasons, and there was no evidence of what was deleted during this restore. (Tr. 930-32).

Indeed, contrary to Buyer's characterizations, (Br. 45-46), the evidence did not "feature heavily" in the Government's summation. The Government did not mention the text messages in summation at all and mentioned the cookie and restore evidence only briefly in an otherwise lengthy closing argument. (A. 491). By contrast, the other evidence of Buyer's insider trading in Navigant was overwhelming and included, as described above, Harkness's testimony about her communications with Stansbury and the email she sent

40

him referencing a "combination" with possible "synergies" (A. 206-14, 545); phone and text message records reflecting Stansbury and Buyer's immediate communications after that email (GX 401, 605); records reflecting Buyer's immediate searching for Navigant's stock symbol that night (A. 549; GX 909); trading records reflecting Buyer's immediate purchase of Navigant stock (A. 271); testimony from Copher about his dinner with Stansbury (A. 113); the highly unusual nature of Buyer's Sprint and Navigant trading compared to his typical trading behavior (A. 273-74); the fact that Buyer used multiple accounts to buy the stocks, including at least one account that only purchased Sprint and Navigant (A. 269); the extremely close temporal connection between Buyer's conversations with persons who had MNPI and his subsequent trades; and Buyer's own implausible statements when later interviewed about relying on analyst reports for the trades (A. 247-64).

When compared to this extensive other evidence supporting the jury's verdict, it is plain that the limited additional datapoints obtained from Stansbury's cellphone did not play a meaningful role in the jury's determination of guilt. Admission of this evidence, even if erroneous, was harmless.

## POINT III

### The Jury and District Court Correctly Rejected Buyer's Venue Arguments

Buyer contends that the trial evidence was insufficient to establish venue and attacks the continuing validity of this Court's clear case law. (Br. 48-59). As both

the jury and Judge Berman correctly concluded, his arguments are meritless. The evidence established that substantial conduct in furtherance of Buyer's criminal activity occurred in the Southern District of New York ("SDNY").

## A.  Relevant Facts

Buyer's stock trades touched the Southern District of New York in several ways. First, all of the trades took place on the New York Stock Exchange, which is headquartered in Manhattan. (A. 265). The trades were conducted using a Manhattan-based executing broker, Virtu Financial, whose Manhattan employees monitored the trades that were occurring and monitored the risk that Virtu was taking through these trades. (A. 298-300). Virtu's data center at which processing of these trades partially occurred was in Purchase, New York, after which the relevant data was sent on to the Depository Trust and Clearing Corporation ("DTCC"). (A. 298-99).[9] And the selling broker for

-----

[9]  Securities trades consist of multiple steps, including execution, clearing, and settlement. "Execution" refers to the matching of purchase and sale orders. "Settlement" is the actual transfer of the shares for money. Between execution and settlement is a process called "clearing," which involves the netting of trades, reporting of trades, and sending of trade confirmations. Netting is the process by which multiple trades for each brokerage firm are offset against each other to determine a single obligation to trading counterparties. (A. 295-300).

42

certain Navigant trades, Two Sigma, which bore the risk as the counterparty in the transactions, was based in Manhattan, and employees in Manhattan monitored the transactions. (A. 295-97).

Moreover, the settlement and storage of Buyer's trades happened on DTCC servers located in Manhattan. A DTCC employee testified that the DTCC had cleared, settled, and recorded the trades at issue, and that portions of all three steps happened in Manhattan. (A. 321). At the relevant times, the DTCC had two computer servers: one in Manhattan, and one in Brooklyn, in the Eastern District of New York. These two computer servers acted together as one logical mainframe: in effect, as one computer. (*Id.*). Each trade came into this one logical mainframe and went to either the Brooklyn or Manhattan computer, depending on volume and timing. The two machines, in effect, split the work between them. (*Id.*). Regardless of which of the two machines were used to settle the trades, the final trade results were then recorded onto both the Manhattan and Brooklyn computers simultaneously. (*Id.*). Each machine maintained a separate record of these trades, should the other half of the combined system fail. (*Id.*). The DTCC employee was clear that all of these steps—the trade data coming in, being processed, and being stored—were a necessary part of DTCC clearing and settling the trades. (*Id.*).

## B. Applicable Law

The proper forum for a criminal prosecution is the district in which the crime was committed. *See* U.S. Const. art. III § 2; U.S. Const. amend. VI; Fed. R.

43

Crim. P. 18. When "the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *United States v. Miller*, 808 F.3d 607, 616 (2d Cir. 2015). Instead, such a defendant may be tried in any district in which some part of the offense occurred. *See, e.g.*, *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). And by statute, any offense "committed in more than one district" may be "prosecuted in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a). The Securities Exchange Act of 1934 similarly provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. The "transaction constituting the violation" in this context is the "purchase or sale of securities" on the basis of inside information. 15 U.S.C. § 78j(b).

This Court has made clear that "[w]here the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate." *United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021); *see also United States v. Geibel*, 369 F.3d 682, 697-98 (2d Cir. 2004) (rejecting challenge to SDNY venue on counts involving purchases of options executed on the American Stock Exchange located and headquartered in the SDNY). Trades that "utilized the facilities of any New York based securities exchange or brokerage firm" suffice to establish venue. *Geibel*, 369 F.3d at 698. The "execution or settlement of a securities trade within [a] district" is also sufficient to establish venue.

44

*United States v. Svoboda*, 347 F.3d 471, 484 n.14 (2d Cir. 2003).

"Despite its constitutional pedigree, venue is not an element of any crime," so it "need be proved only by a preponderance of the evidence." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). This Court reviews the sufficiency of venue evidence "de novo, considering the evidence in the light most favorable to the government." *Id.* To view the evidence in that light, the Court "draw[s] all inferences in the government's favor and defer[s] to the jury's assessments of the witnesses' credibility." *United States v. Allah*, 130 F.3d 33, 45 (2d Cir. 1997); *accord United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014); *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010).[10]

## C. Discussion

Here, the evidence easily demonstrated by a preponderance that core components of Buyer's insider trading occurred in SDNY, as Judge Berman correctly and repeatedly concluded. (*See* SPA 3-4 (denying post-trial motion because "venue requirement was readily met by the Government"); A. 76-77 (denying bail pending appeal because venue "was clearly established in this case" for multiple reasons)).

First, all of Buyer's stock trades took place on the New York Stock Exchange, which is headquartered in

---

[10] The Supreme Court recently clarified that improper venue results in, at most, a new trial, not a judgment of acquittal. *See Smith v. United States*, 599 U.S. 236 (2023).

45

Manhattan. (A. 265). Under this Court's binding precedent, that is the end of the matter. *Chow*, 993 F.3d at 143; *Geibel*, 369 F.3d at 697-98; *Svoboda*, 347 F.3d at 483. Although Buyer argues that that line of cases should be abrogated because it originates from a time when trades were physically executed by a human being on the floor of the exchange, (Br. 50-54), this panel remains bound by them. *See, e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court."). Indeed, this Court has adhered to this line of precedent as recently as 2021. *See Chow*, 993 F.3d at 143 ("Chow's challenge to venue in the Southern District of New York . . . is foreclosed by the established law of this Circuit. Where the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate."). This Court has also recently held that venue exists in SDNY if the trades occurred on the NASDAQ, which is also headquartered in Manhattan, even though NASDAQ has *never* had a physical trading floor and has *always* been an electronic exchange. *United States v. Riley*, 638 F. App'x 56, 62 (2d Cir. 2016).

Buyer's attempt to narrow this Court's clear language in *Chow* by arguing that this Court must not have meant what it said is ineffective. (Br. 51-53). It is of no moment that this Court, after conclusively stating that the fact that the trades occurred on an exchange located in SDNY established venue, went on to recount additional facts that also would be sufficient

46

to establish venue. *See Chow*, 993 F.3d at 143. There is no basis in this Court's language to conclude that those additional facts were necessary to its application of the *Svoboda* line of cases.

This Court need not decide the continuing validity of the *Svoboda* line of cases, however, because even if more was required to establish venue, substantial additional evidence supported the conclusion that Buyer's trades occurred in part in SDNY. As Judge Berman concluded, (SPA 3-4), Buyer's trades were conducted using a Manhattan-based executing broker (A. 298-300); were processed by a data center in Westchester County, (A. 299),[11] and were cleared and settled using servers located in lower Manhattan, (A. 183-84). This testimony, which the jury was entitled to accept, is sufficient to establish that Buyer's trades occurred in part in SDNY. *Svoboda*, 347 F.3d at 484 n.14 (noting that the "execution or settlement of a securities trade within this district" was sufficient to establish venue). In addition, the selling broker for certain Navigant trades was based in Manhattan, and

---

[11] Buyer dismissively argues that the data center in Westchester was a "brief (and seemingly unnecessary) detour" in the routing path of the trading data. (Br. 59). But Buyer does not offer any support for this argument, which is squarely contradicted to the trial testimony. The Virtu representative testified that the data center was part of Virtu's clearance and settlement process, an important and necessary part of a trade's lifecycle. (A. 299).

47

this Manhattan office bore the risk as the counterparty in the transactions. (A. 295, 297).

Moreover, the trial testimony also established that the trades were finally processed and stored on the DTCC's Manhattan server. Although DTCC records did not reflect which half of the single logical mainframe any particular trade was assigned, Buyer's offenses involved a large number of distinct trades—46 stock purchases in total. (A. 682-91). The testimony established that each trade was assigned in real time to either the Manhattan or the Brooklyn computer depending on load-balancing needs at the time. There is no basis in the record to conclude that, under a preponderance standard, it is more likely than not that coincidentally all five Sprint trades and all 41 Navigant trades happened to be routed, by chance, exclusively to the Brooklyn half of the system.[12] And in any event, regardless of which half of the mainframe was used to settle and clear the trades, all of Buyer's trades were then routed to the Manhattan computer for recording. Contrary to Buyer's assertion, this was not an afterthought or a technicality. (Br. 57-58). Rather, the DTCC representative testified that both the Manhattan and Brooklyn computers served as an important, separate record of these trades, should the other

---

[12] For example, if the division of work approximated a 50/50 split between the two servers over time, then there is a 96% likelihood that at least one of the five Sprint trades was processed in Manhattan and essentially a 100% likelihood that at least of the 41 Navigant trades was so processed.

48

computer fail. The testimony was clear that all of these steps—the trade data coming in, being processed, and being stored—were a necessary part of DTCC clearing and settling the trades. (A. 321). Lastly, DTCC had its command center in Manhattan, where its employees monitored and oversaw all the transactions that took place. (A. 322).

Drawing all inferences in the Government's favor, this evidence was more than sufficient to establish by a preponderance that venue was proper in the Southern District of New York.

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
             April 5, 2024

                         Respectfully submitted,

                         DAMIAN WILLIAMS,
                         *United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States*
                                *of America.*

MARGARET GRAHAM,
JACOB R. FIDDELMAN,
    *Assistant United States Attorneys,*
             *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 11,488 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: JACOB R. FIDDELMAN,
*Assistant United States Attorney*